1      THE HONORABLE JAMES L. ROBART

2

3

4

5

6

7              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON
8                      AT SEATTLE

9    0912139 B.C. LTD., a Canadian corporation,     No. 2:18-cv-01464-JLR
     and PAKAGE APPAREL INC., a Canadian
10   corporation,                                   PLAINTIFFS' OPENING CLAIM
                                                    CONSTRUCTION BRIEF
11                     Plaintiffs,
                                                    Responsive Brief Due Date:  June 7, 2019
12          v.
                                                    Claim Construction Hearing:  July 12, 2019
13   RAMPION USA INC., a Washington
     corporation, and RAMPION ENTERPRISES
14   LTD., a Canadian corporation,

15                     Defendants.

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF (101938117.2 0068561-00001)

1

# TABLE OF CONTENTS

2

**Page**

3   I.    INTRODUCTION ..............................................................................................1

4   II.   LEGAL STANDARDS FOR CLAIM CONSTRUCTION ...................................1

III.  ARGUMENT......................................................................................................2

5        A.    Overview of the Asserted Patents ............................................................2

6        B.    "Front Portion" (Joint Claim Chart (ECF No. 47-1) ("JCC") at 1-23) ......................4

        C.    "Stretch Panel" (JCC at 71-82) .............................................................8

7

        D.    "Gathered from Side-to-Side and Top-to-Bottom by the Stretch Panel"  (JCC

8                at 50-63)......................................................................................10

9        E.    "Top Location" / "Bottom Location" (JCC at 24-32)....................................12

        F.    "Substantially Continuously Along Either Side of the Front Portion" (JCC at

10            32-50).........................................................................................15

11        G.    "Crotch Panel" (JCC at 82-85) ...........................................................17

        H.    "Asymmetrical Stretch Characteristics" (JCC at 63-65) ...........................................18

12        I.    "Rectangular" (JCC at 65-68).............................................................20

13        J.    "A Dart Seam Stitched Along a Bottom Portion of the Pouch" (JCC at 68-70).........22

IV.  CONCLUSION.................................................................................................24

14

15

16

17

18

19

20

21

22

23

24

25

26

1

**TABLE OF AUTHORITIES**

2

**PAGE**

3

**Cases**

4

5

*Adapt Pharma Operations Ltd. v. Teva Pharm. USA, Inc.,*
   No. 16-7721, 2019 WL 1789463, at *4 (D.N.J. Apr. 24, 2019)....................................20

6

*Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
   314 F.3d 1313 (Fed Cir. 2003)........................................................................................24

7

8

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
   340 F.3d 1298 (Fed. Cir. 2003)........................................................................................6

9

*AstraZeneca AB v. Andrx Labs, LLC,*
   No. 14-8030, 2017 WL 111928 (D.N.J. Jan. 11, 2017)...................................................14

10

11

*Cacace v. Meyer Mktg. (Macau Commercial Offshore) Co.,*
   812 F. Supp. 2d 547 (S.D.N.Y. 2011) .............................................................................20

12

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.,*
   35 F. Supp. 3d 1176 (C.D. Cal. 2014) .............................................................................19

13

14

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002)......................................................................................2, 5

15

*CSB-Sys. Int'l Inc. v. SAP Am., Inc.,*
   No. 10–2156, 2011 WL 3240838 (E.D. Pa. July 28, 2011)............................................20

16

17

*dunnhumby USA, LLC v. emnos USA*
   *Corp.*, No. 13-CV-0399, 2015 WL 1542365 (N.D. Ill. Apr. 1, 2015) ..........................19

18

19

*Epos Techs. Ltd. v. Pegasus Techs. Ltd.,*
   766 F.3d 1338 (Fed. Cir. 2014)...................................................................................12, 21

20

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH,*
   972 F.2d 1272 (Fed. Cir. 1992)........................................................................................2

21

22

*Home Diagnostics, Inc. v. LifeScan, Inc.,*
   381 F.3d 1352 (Fed. Cir. 2004)........................................................................................14

23

24

*Honeywell Inc. v. Victor Co. of Japan, Ltd.,*
   298 F.3d 1317 (Fed. Cir. 2002)........................................................................................6

25

26

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone 206.624.0900

1

**TABLE OF AUTHORITIES**

2

PAGE

3

*Inline Plastics Corp. v. EasyPak, LLC,*
   799 F.3d 1364 (Fed. Cir. 2015)............................................................................7

4

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n,*
   690 F.3d 1318 (Fed. Cir. 2012)........................................................................5, 15

5

6

*Intergraph Hardware Techs. Co. v. Toshiba Corp.,*
   508 F. Supp. 2d 752 (N.D. Cal. 2007)................................................................20

7

*Kaneka Corp. v. Xiamen Kingdomway Grp., Co.,*
   790 F.3d 1298 (Fed. Cir. 2015)............................................................................7

8

9

*Kara Tech. Inc. v. Stamps.com Inc.,*
   582 F.3d 1341 (Fed. Cir. 2009)..........................................................................15

10

*Laitram Corp. v. NEC Corp.,*
   163 F.3d 1342 (Fed. Cir. 1998)............................................................................2

11

12

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370 (1996)......................................................................................1, 20

13

14

*Merrill v. Yeomans,*
   94 U.S. 568 (1876).............................................................................................2

15

16

*Nat'l Prods. Inc. v. Belkin Int'l, Inc.,*
   No. C16-402, 2017 WL 3084435 (W.D. Wash. July 19, 2017)..............................6

17

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
   572 U.S. 898 (2014).........................................................................................19

18

19

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.,*
   521 F.3d 1351 (Fed. Cir. 2008)......................................................................9, 17

20

*Oatey Co. v. IPS Corp.,*
   514 F.3d 1271 (Fed. Cir. 2008)............................................................................5

21

22

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n,*
   161 F.3d 696 (Fed. Cir. 1998)...........................................................................19

23

24

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)........................................................1, 2

25

26

PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF (101938117.2 0068561-00001) - iii

1

**TABLE OF AUTHORITIES**

2

**PAGE**

3 *Plantronics, Inc. v. Aliph, Inc.,*

4     724 F.3d 1343 (Fed. Cir. 2013) ................................................................. 15

5 *Prima Tek II, L.L.C. v. Polpap S.A.R.L.,*
    318 F.3d 1143 (Fed. Cir. 2003) .................................................................. 7

6

7 *Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001) ............................................................ 5, 15

8 *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.,*

9     844 F.3d 1370 (Fed. Cir. 2017) ............................................................... 19

10 *Sulzer Textil A.G. v. Picanol N.V.,*
    358 F.3d 1356 (Fed. Cir. 2004) ............................................................ 4, 9

11 *Thorner v. Sony Computer Entm't Am. LLC,*

12     669 F.3d 1362 (Fed. Cir. 2012) ................................................................. 5

13 *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,*
    366 F.3d 1311 (Fed. Cir. 2004) ................................................................. 7

14

15 *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,*
    141 F.3d 1084 (Fed. Cir. 1998) ................................................................. 2

16 *Virnetx, Inc. v. Cisco Sys., Inc.,*

17     767 F.3d 1308 (Fed. Cir. 2014) ................................................................. 4

18 *Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................... 12, 21

19

**Statutes**

20

21 35 U.S.C. § 112 ¶ 2 ....................................................................................... 2

**Other Authorities**

22

23 *Black's Law Dictionary* (10th ed. 2014) ...................................................... 24

24

25

26

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

I.    INTRODUCTION

Plaintiffs ("BN3TH") and Defendants ("Rampion") compete in the market for comfortable men's undergarments with supportive pocket technology.  BN3TH created the technology in 2009 and 2010.  In late 2010, Rampion became a distributor of BN3TH's undergarments which were then sold under the brand "MyPakage."  After the parties ceased doing business together, Rampion introduced a competing brand called 2UNDR, which was developed using BN3TH's proprietary technical specifications and with knowledge of BN3TH's then-pending patent applications. BN3TH's U.S. patents recently issued, leading to this lawsuit seeking to stop Rampion's ongoing and willful patent infringement.

The technology at issue—comfortable and supportive men's undergarments—and the terminology used in U.S. Patent Nos. 9,687,030 ("the '030 patent") and 10,034,496 ("the '496 patent) ("Asserted Patents") are familiar and easily understood.  The underwear claimed in the Asserted Patents includes new features in novel combinations, but the basic use, functionality, and structure of men's underwear are widely known, making the Asserted Patents' advances over the prior art readily apparent.  Despite the accessible subject matter and terminology, claim construction is contentious because Rampion, caught with its hand in the cookie jar, if force to advocate unfounded claim construction positions to try to prop up its tactical positions in litigation.  For example, in an effort to distinguish its accused products as outside the scope of the patent claims, Rampion seeks to unduly narrow certain claim terms by importing limitations from mere examples in the specification.  As shown below, Rampion's claim constructions are unsupported by law or the intrinsic record, and if adopted would lead to legal error.

II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

A patent consists of two parts: (1) the specification, which includes the drawings and explanatory text, and (2) the numbered claims. The claims define the scope of the patent.  Via claim construction, the Court resolves any disputes as to claim scope, so the jury can decide disputed questions of fact. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996); *Phillips v.*

1   *AWH Corp.*, 415 F.3d 1303, 1311-12 (Fed. Cir. 2005) (*en banc*).

2   The starting point for any claim construction is the language of the claims themselves.

3   *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1089 (Fed. Cir. 1998).  Patent

4   claims and their limitations "define or delimit the scope of the ... patent 'monopoly.'"  *Gen. Foods*

5   *Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992).  Claims are therefore

6   "'of primary importance, in the effort to ascertain precisely what it is that is patented.'"  *Phillips*, 415

7   F.3d at 1312 (quoting *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876)).

8   Because claim language is required to "particularly point[] out and distinctly claim[] the

9   subject matter which the applicant regards as his invention," 35 U.S.C. § 112 ¶ 2 (pre-AIA), and

10  because it provides the only explicit notice to the world of the scope of the monopoly, there is a

11  "'heavy presumption' that a claim term carries its ordinary and customary meaning," *CCS Fitness,*

12  *Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (citation omitted).  The "ordinary and

13  customary meaning" refers to the understanding of a person of ordinary skill in the art ("POSA").

14  *See, e.g., Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). The understanding of a

15  claim term to a POSA must be considered "not only in the context of the particular claim in which

16  the disputed term appears, but in the context of the entire patent, including the specification."

17  *Phillips*, 415 F.3d at 1313.

18  **III.    ARGUMENT**

19  **A.    Overview of the Asserted Patents**

20  The Asserted Patents are part of a single patent family:  the '496 patent is a child of the '030

21  patent.  The application that led to the '496 patent is a continuation of, and claims priority through,

22  the application that led to the '030 patent.  Both patents claim priority back to U.S. Provisional Patent

23  Application No. 61/429,065, which was filed on December 31, 2010.

24  Both patents are directed to a men's undergarment, the body of which includes a front portion

25  and a back side joined to a waistband via a waistband seam.  The body also includes leg openings for

26  the wearer's legs.  In the area adjacent to the wearer's crotch, the bottom of the front portion and the

1  bottom of the back side are each attached to a third panel of fabric (a crotch panel), which is also part

2  of the body of the undergarment.  The seam where the crotch panel attaches to the front portion is

3  referred to as the "first seam."

4        Inside this body of the underwear described in Claim 1 of each Asserted Patent, a stretch

5  panel made from elastically resilient four-way stretch material is attached to the front portion at the

6  top, bottom, and side edges of the stretch panel.  The stretchy material of the stretch panel pulls



FIG. 7

together (gathers) the four edges where it is attached to the front portion of the body of the underwear, pulling what would otherwise be a relatively flat surface of the front portion into a three-dimensional pouch structure.  For example, the side cross-section view shown in Fig. 7 of both Asserted Patents (annotated at left) shows how the stretch panel (22) pulls together (gathers) the front portion (18) from top to bottom to make that relatively flat fabric panel into a three-dimensional pouch (20).  The stretch panel likewise pulls together (gathers)

19  the front panel into a pouch from side to side.  There is an opening in the stretch panel through which

20  the wearer's genitals are easily inserted when putting on the underwear, such that the wearer's

21  genitals are held and supported in the pouch structure, and supported from behind and below by the

22  stretch panel. *See* '496 patent, Claim 1 & Figs. 1-8; '030 patent, Claim 1 & Figs. 1-8.

23        The key difference between Claim 1 of the two Asserted Patents—and the reason BN3TH

24  has asserted each Asserted Patent against different accused products—is that Claim 1 of the '030

25  patent requires that the top edge of the stretch panel attach to the front portion at the waistband seam,

26  and the bottom edge attach to the front portion at the first seam.  In contrast, Claim 1 of the '496

1  patent was lacks this requirement, instead coining the term "top location" for wherever the top edge

2  of the stretch panel attaches to the front portion, and the term "bottom location" for wherever the

3  bottom edge of the stretch panel attaches to the front portion.

4  **B.**     **"Front Portion" (Joint Claim Chart (ECF No. 47-1) ("JCC") at 1-23)**

| | |
|---|---|
| **BN3TH:** Region of the garment's body that is situated in front of the wearer when the garment is worn and to which the stretch panel is attached to form a concave space between the front portion and the stretch panel capable of receiving the wearer's genitals | **Rampion**: The outermost layer of fabric of the body of the male garment bounded by the side seams, waistband seam, and first seam. |

9       The term "front portion" has a readily understood meaning as explained both in the Asserted

10  Patents[1] and in the field of garment design and production.  Nevertheless, Rampion tries to prop up

11  its noninfringement position by improperly narrowing this term in two ways: (1) adding "outermost

12  layer of fabric" in an effort to distinguish Rampion's accused products, which have a two-layer

13  "front portion," and (2) artificially restricting the definition of "front portion" to only a small part of

14  the front of the undergarment.  Nothing in the intrinsic or extrinsic evidence supports such narrowing

15  the scope of "front portion."

16       Claim construction starts with the full breadth of the plain and ordinary meaning of the claim

17  language itself to a POSA.  *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1316 (Fed. Cir. 2014).

18  Nothing in the claim language, either the words "front portion" or the surrounding text of the claim,

19  requires the front portion to be the single "*outermost layer of fabric*" in the body of the garment, as

20  Rampion proposes. Rather, the claim suggests only that the front portion is the part of the body of the

21  garment that is situated in front of the wearer.[2] *See, e.g.,* '496 Patent, Claim 1 ("a body including a

22  [1] The two Asserted Patents share substantially the same specification.  Except where otherwise indicated, citations to
23  "Specification" or "Spec." herein are to the specification of the '030 patent.  The corresponding disclosure in the '496
    patent is cited in BN3TH's column of the JCC, Dkt. 47-1.
24  [2] The last clause of BN3TH's proposed construction of "front portion" ("and to which the stretch panel is attached to
    form a concave space between the front portion and the stretch panel capable of receiving the wearer's genitals"),
25  reflects surrounding claim language from independent Claim 1 of each Asserted Patent and is included in the
    proposed construction to aid the trier of fact in understanding how the front portion and stretch panel interact in the
    claimed invention.  Providing such context to lay jurors avoids potential juror confusion is an important aspect of
26  claim construction.  *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court

1    front portion and having leg openings for a wearer's legs" and "a stretch panel attached to the body

2    inside the front portion, the stretch panel . . . having a top edge attached to the body at a top location,

3    a bottom edge attached to the body at a bottom location, side edges attached to the body at side

4    seams . . ."); *see also, e.g.,* '030 patent Claim 1.  Likewise, the plain and ordinary use of "front" and

5    "front portion" in the garment industry describes the portion of a garment *situated in front of the*

6    *wearer.  See* JCC Ex. 8 (*Practical Guide to Patternmaking for Fashion Designers: Menswear*, at 85,

7    124, 145, 160-61).  Usage in the industry also demonstrates that such a "front portion" of a garment

8    can comprise *multiple* panels or layers, not just the single outermost layer as Rampion urges here.  *Id.*

9    at 124 (describing as "front" of men's shorts an area disposed in front of the wearer and comprising

10   two separate fabric panels partially overlapping and stitched together).

11          Claim language is entitled to the full breadth of its plain and ordinary meaning, unless the

12   specification or prosecution history mandates a narrower construction.  *InterDigital Commc'ns, LLC*

13   *v. Int'l Trade Comm'n*, 690 F.3d 1318, 1324 (Fed. Cir. 2012) (reversing International Trade

14   Commission's narrow construction of the claim element "code" where "[n]either the specification

15   nor the prosecution history contains a restrictive definition of 'code'").  Absent a clear definition or

16   disavowal of scope, claim terms are entitled to the full scope of their ordinary meaning. *CCS Fitness*,

17   288 F.3d at 1366-69 (reversing district court construction as unduly narrow because specification did

18   not define or disclaim the scope of the claim language); *Oatey Co. v. IPS Corp.*, 514 F.3d 1271,

19   1275-77 (Fed. Cir. 2008) (same); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367

20   (Fed. Cir. 2012).  Even where the specification of the patent describes only one exemplary

21   embodiment, patent claims with broader meaning are not limited to that embodiment.  *See, e.g.,*

22   *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1343-44 (Fed. Cir. 2001) (reversing district court's

23   claim construction that required claimed components to be physically separate because plain

24   meaning of claim language could encompass either separate or integral structures).  When the

25   _____

26   must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury
     will be able to intelligently determine the questions presented." (internal quotation marks and citation omitted)).

1   specification uses a term in a variety of ways, such usage "attests to the breadth of [the] term."

2   *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003).

3          Here, the prosecution history of the '030 patent expressly describes, using the claim phrase at

4   issue, a men's undergarment with a "front portion" that is made from ***two layers*** (*i.e.*, an inner and

5   outer layer of the front portion), both of which the patentee described as part of the "front portion."

6   JCC Ex. 3 at 63-64 ('030 Pros. Hist., Oct. 25, 2013 Resp. to Office Action) ("Reis does not disclose

7   'the front portion being gathered from side-to-side and top-to-bottom by the stretch panel whereby a

8   three-dimensional pouch is defined between the stretch panel and the front portion'.  Rather, Reis

9   discloses the ***two layers*** of material ***in the front portion*** being stitched together in such a way as to

10  give a shape to the overall article . . . ." (emphases added)).  This discussion in the prosecution

11  history of a ***two-layer "front portion"*** is directly contrary to Rampion's proposal that only the

12  ***"outermost" layer*** of fabric can be the "front portion."  *See Honeywell Inc. v. Victor Co. of Japan,*

13  *Ltd.*, 298 F.3d 1317, 1323-24 (Fed. Cir. 2002) (discussion in prosecution history made clear that

14  inventor intended broader meaning of "contiguous," not more common narrower meaning of the

15  term, such that the broader meaning was the proper construction); *Nat'l Prods. Inc. v. Belkin Int'l,*

16  *Inc.*, No. C16-402, 2017 WL 3084435, at *7 (W.D. Wash. July 19, 2017) (examples discussed in

17  prosecution history demonstrated that the words "joined between" did not require physical contact on

18  both sides of the rib component and, as such, proposed narrowing construction requiring such contact

19  was improper).

20         The Specification also contemplates that the front portion may have a multi-part construction

21  to accommodate a fly opening.  Spec. at 2:34-48.  More telling, the Specification expressly and

22  repeatedly calls out ***both the outer surface and the inner surface*** of the front of the body of the

23  underwear as being part of the "front portion," including an arrow that points through the opening in

24  the stretch panel to call the *inside surface* of the pouch a part of the "front portion" of the body of the

25  underwear.  Spec. at 2:1-2 & Figs. 3-4 (showing "front portion" as item 18).  These varied examples

26  from the Specification and prosecution history demonstrate the breadth of the term "front portion"

1   and show that Rampion's proposal to limit the front portion to the "outermost layer of fabric" is not

2   how a POSA would understand the term in light of the Specification.  *See Prima Tek II, L.L.C. v.*

3   *Polpap S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003) (holding that varied specification examples

4   "demonstrate[] the breadth of the term rather than providing a limited definition," and holding that

5   claim term "floral holding material," subject to various *examples* in specification, should be

6   understood broadly to include a material of *any* shape or type); *Inline Plastics Corp. v. EasyPak,*

7   *LLC*, 799 F.3d 1364, 1371 (Fed. Cir. 2015) (reversing district court construction of "frangible

8   section" as requiring at least two score lines where the specification described an example with a

9   single score line as an alternative embodiment); *Kaneka Corp. v. Xiamen Kingdomway Grp., Co.*,

10   790 F.3d 1298, 1305 (Fed. Cir. 2015) (reversing construction of "sealed" as requiring prevention of

11   entry/exit of any materials, where specification included discussion of examples where solvents

12   could enter/ exit tank and sealing of tank merely prevented exposure of contents to the atmosphere).

13       In contrast, Rampion relies on narrower individual definitions selected from among broader

14   definitions in *general-purpose* dictionaries of the single term "front," *see* JCC at 22-23 (Rampion

15   citing JCC Exs. 9-12).  But the same general-purpose dictionary definitions of "front" contain other

16   definitions **consistent** with the use of "front portion" in the Specification and the prosecution history

17   as the part of the garment in front of the wearer.  This demonstrates that BN3TH's construction is

18   more consistent with the full breadth of the ordinary meaning of "front."[3]  In any event, even if the

19   general-purpose definition of "front" was limited to "outermost" (it is not), Rampion errs by relying

20   on general-purpose definitions of "front" to narrow the plain and ordinary meaning of "front portion"

21   to a POSA in the garment industry.  *See Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*,

22   366 F.3d 1311, 1321 (Fed. Cir. 2004) (where a POSA would understand a term differently in context,

---

[3] *See, e.g.,* JCC Ex. 9 (definition of "front" includes "the part or side of anything that faces forward: *the front of a jacket*" and "in a forward place or position"); JCC Ex. 10 (definition of "front" includes "in a position close to the most forward or most important part"); JCC Ex. 11 (definition of "front" includes "[s]ituated at the front," "[p]osition directly before or in the path of something," and "[t]he foremost *or forward* part or surface of anything" (emphasis added)); JCC Ex. 12 (definition of "front" includes "the part of a building, object, or person's body which faces forward").  Nothing limits "front portion" to the single outermost layer of fabric.

1    that understanding of a POSA controls over general-purpose dictionaries, particularly where only a

2    single example or portion of a definition from a general-purpose dictionary is relied upon).

3           Second, Rampion also attempts to improperly limit the "front portion" to the area of the body

4    of the men's undergarment "bounded by the side seams, waistband seam, and first seam." JCC at 1.

5    This limitation is inconsistent with the actual language of Claim 1 of both Asserted Patents.  The

6    '030 patent claims state that the *stretch panel*—not the front portion—has outer edges defined by the

7    side seams (on the sides *of the stretch panel*) and the waistband and first seam (on the top and

8    bottom of the stretch panel), respectively.[4] '030 patent Claim 1.  Nothing about the plain meaning of

9    "front portion," which as discussed above is used to describe the part of a garment disposed in front

10   of the wearer, limits "front portion" to the small part of the front of the garment that is between the

11   four seams Rampion has selected.  Furthermore, the plain meaning of "front portion" urged by

12   BN3TH is entirely consistent with Fig. 4 of the Specification, which shows the "front portion," Spec.

13   at 2:1-2 ("FIG. 4 is an enlarged view of the front portion of the undershorts of FIG. 1 viewed from

14   inside."), as extending clearly beyond the side seams and including the adjacent material outside the

15   side seams.

16          For all these reasons, the "front portion" should be construed, consistent with the full breadth

17   of its plain and ordinary meaning to a POSA, as the "region of the garment's body that is situated in

18   front of the wearer when the garment is worn and to which the stretch panel is attached to form a

19   concave space between the front portion and the stretch panel capable of receiving the wearer's

20   genitals."

21   **C.      "Stretch Panel" (JCC at 71-82)**

22   | **BN3TH:** Four-way stretch material separate from and joined to the inside of the garment's body that includes an opening for the wearer's genitals. | **Rampion**: Plain and ordinary meaning. |
23   | | |
24

25   ─────────────────────
     [4] The claims of the '496 patent, in contrast, were specifically amended to be broader, and call for the top and bottom of the
26   stretch panel to end at a "top location" and a "bottom location," which need not be precisely at the waistband seam or first
     seam, as discussed in detail in Section III.E., below.

1   BN3TH seeks to construe "stretch panel" consistent with the surrounding language in the

2   claims and with the descriptions of the structure of the stretch panel in the Specification.  Instructing

3   the jury only that "stretch panel" carries its "plain and ordinary meaning" without providing any

4   indication of what that meaning is, as Rampion urges, would be unhelpful to the trier of fact.

5   "Stretch panel" is not a phrase that jurors are likely to be familiar with outside of this case.

6   Accordingly, construing this phrase with an explanation of its meaning would aid the trier of fact.

7   *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court must

8   instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so

9   that the jury will be able to intelligently determine the questions presented." (internal quotation marks

10  and citation omitted)).

11      In any event, Rampion's position that this term needs no construction conceals a real dispute

12  between the parties as to the meaning of "stretch panel."  While BN3TH contends that, consistent

13  with the Specification, the stretch panel must be four-way stretch material ***separate from*** and joined

14  to the ***inside*** of the garment's body, Rampion has asserted that prior art references contain a "stretch

15  panel" that is ***part of*** or located ***outside*** of the body of the undergarment.  *See, e.g.,* ECF No. 34-3

16  (Jan. 28, 2019 Invalidity Contentions, Table B-1 at 24 to 34 of 100 (discussing U.S. Patent

17  Publication No. 2004/0025218)).  Because there is a live dispute between the parties as to the

18  meaning and breadth of the claim phrase "stretch panel," Rampion's position that this term need not

19  be construed is legally erroneous.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d

20  1351, 1360 (Fed. Cir. 2008)  ("[w]hen the parties raise an actual dispute regarding the proper scope

21  of these claims, the court, not the jury, must resolve that dispute," even if one or both parties assert

22  that no express construction is necessary because the term has a plain and ordinary meaning).

23      The context of the claim language itself is clear and specific in requiring that the "stretch

24  panel" be separate, elastically resilient four-way stretch material "attached to the body inside the

25  front portion" (of the body).  *See, e.g.,* '030 patent Claim 1 (requiring "a body" including both "a

26  front portion" and "a crotch panel," but describing the "stretch panel" as "attached to the body inside

1   the front portion"—*not* as part of the structures forming the body of the male garment).  The

2   Specification and prosecution history likewise confirm this construction of "stretch panel" as separate

3   material attached inside of the body of the garment.  *See, e.g.,* Spec. at Figs 1-16, Abstract ("Next-to-

4   skin garments for men include an internal stretch panel."), 2:15-16 ("FIG. 16 shows a stretch panel

5   before and during being sewn into a garment."), 3:34-38 ("Thus the illustrated undershorts are one

6   example of a men's garment comprising: a waistband; a front wall 35 depending downwardly from

7   the waistband, ***a stretch panel attached behind the front wall*** so that the fron[t] wall and stretch

8   panel provide a pouch . . ." (emphasis added)); *see also* JCC at 71-74 (BN3TH column, providing

9   additional citations and summary of supporting passages in Specification and prosecution history).

10   Similarly there is no question that all claims of the Asserted Patents require an aperture in the stretch

11   panel to allow insertion of the wearer's genitals through the stretch panel opening and into the pouch.

12   *See, e.g.,* Spec. at Figs. 1-16,  Abstract ("An opening in the stretch panel receives a wearer's external

13   genitalia."), 1:34-56 (the garment of the invention includes "a stretch panel having an opening for

14   receiving a wearer's genitals"); *see also* JCC at 71-74 (additional examples). Moreover, usage of

15   "panel" in the garment industry is consistent with the intrinsic record and also refers to a "panel" as a

16   ***separate*** piece of fabric, attached by seams to adjacent material.  *See* JCC Ex. 50 (*The Practical*

17   *Guide to Patternmaking for Fashion Designers: Menswear*, at 5, 97-98, 147, 152, 157, 172, 173).

18        Adoption of BN3TH's proposed construction of "stretch panel" is appropriate to resolve the

19   parties' dispute and establish that structures that are ***part of*** the body of the garment or are located

20   ***outside*** the body of the garment are not a separate "stretch panel" as required by the claims of the

21   Asserted Patents.

22   **D.    "Gathered from Side-to-Side and Top-to-Bottom by the Stretch Panel"**
        **(JCC at 50-63)**

23

| BN3TH: Plain and ordinary meaning; *in the alternative*: the front portion of the garment's body is drawn up both horizontally and vertically through attachment to the stretch panel, creating a concave space between the stretch panel and the front portion of the garment's body capable | Rampion: Puckered by the stretch panel along each of the side, waistband, and first seams. |
|---|---|

| of receiving the wearer's genitals when the garment is worn. | |

As discussed above, the claim language of Claim 1 of each Asserted Patent describes that the stretch panel, due to its elastic four-way stretch properties, gathers (*i.e.*, pulls together, draws up) the parts of the front portion attached to the top, bottom, and side edges of the stretch panel.  By pulling together these edges, the stretch panel lifts the otherwise relatively flat front portion into a more three-dimensional pouch shape, and creates a three-dimensional space between the (now curved) front portion and the stretch panel.  For example, Claim 1 of the '496 patent requires, in part:

> [T]he stretch panel being resiliently elastic both in a direction between the top edge and the bottom edge and in a direction between the side edges, the stretch panel having a length when unstretched smaller than a length measured along the front portion between the top and bottom locations and a width when unstretched smaller than a width measured along the front portion between the side seams such that the front portion is gathered from side-to-side and top-to-bottom by the stretch panel and defines a three-dimensional pouch between the stretch panel and the front portion ….

The vertical aspect (top-to-bottom) of this drawing up of the front portion by the stretch panel is clearly illustrated in Fig. 7 of both Asserted Patents (reproduced and annotated in Section III.A., above).  This concept is also repeatedly described in the Specification.[5]  The claim language, in context, uses "gathered" only in its general, everyday sense, not in any technical sense.

Rampion, however, claims that "gathered from side-to-side and top-to-bottom by the stretch panel" means that the fabric of the undergarment must be "[p]uckered . . . along each of the side, waistband, and first seams."  This construction lacks any support in the Specification or elsewhere in the intrinsic record.  Indeed, Rampion's proposed construction is flatly inconsistent with, and would read out, the embodiments actually disclosed in the Specification.  Nothing in the Specification mentions puckering, or any synonym for puckering, as occurring, much less being required to occur, along the side, top, and bottom seams attaching the stretch panel to the front portion.  Certain figures

---

[5] *See, e.g.* Spec. at 4:22-24 ("The two-way elasticity of stretch panel 22 helps to gather the material of front portion 18 of body 14 to increase the volume of pouch 20."); 6:13-18( "After assembly, stretch panel 22 can contract. This gathers the material of front portion 18 and helps to form pouch 20 to have a three-dimensional volume . . . ."); *see also* JCC at 51-52 (citing and summarizing additional discussion in Specification and prosecution history).

1  of the '030 patent show some wrinkling of material that perhaps could be described as puckering, but

2  that wrinkling is shown in the middle of the fabric panels, and never along the seams that connect the

3  stretch panel to the front portion.  '030 patent Figs. 9-15.  None of the stretch panel seams of any

4  embodiment described or depicted anywhere in either Asserted Patent features any puckering;

5  instead each seam captured in the figures is shown as being flat and smooth.  *See* '030 patent Figs. 1-

6  16; '496 patent Figs. 1-9.  <u>Rampion's proposed construction is legally improper, as it would read out</u>

7  <u>all preferred embodiments discussed and depicted in the Specification, none of which include the</u>

8  <u>"puckering" Rampion contends is required.</u>  *See Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d

9  1338, 1347 (Fed. Cir. 2014) (reversing district court's construction "because it reads out preferred

10  embodiments"); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (a claim

11  construction so narrow as to exclude the principal preferred embodiments "is rarely, if ever, correct

12  and would require highly persuasive evidentiary support").

13  Rampion's proposed construction is also erroneous because it would require the top of the

14  stretch panel to attach to the front portion of the body at the "waistband seam" and the bottom of the

15  stretch panel to attach to the front portion of the body at the "first seam," which is inconsistent with

16  the claims of the '496 patent, as discussed below.  *See infra* Section III.E.

17  For all of these reasons, BN3TH's proposed construction of this phrase should be adopted,

18  and Rampion's proposed construction rejected.

19  **E.    "Top Location" / "Bottom Location" (JCC at 24-32)**

| **BN3TH:** Top Location:  Plain and ordinary meaning; *in the alternative:*  region where the top edge of the stretch panel is attached to the front portion of the body of the garment. | **Rampion**: Top Location: The seam connecting the body of the male garment and the stretch panel to the waistband. |
|---|---|
| **BN3TH:** Bottom Location: Plain and ordinary meaning; *in the alternative:*  region where the bottom edge of the stretch panel is attached to the front portion of the body of the garment. | **Rampion**: Bottom Location: The seam connecting the crotch panel and the stretch panel to the front portion. |

25  As discussed above, *see supra* Section III.A., the sole independent claim of the '030 patent

26  requires the top edge of the stretch panel to attach to the front portion at the waistband seam, and the

1   bottom edge of the stretch panel to attach to the front portion at the first seam, where the front portion

2   is joined to the crotch panel.  '030 patent Claim 1.  Claim 1 of the '496 patent is nearly identical to

3   Claim 1 of the '030 patent in most respects, but it drops the requirement that the top edge of the

4   stretch panel must attach at the waistband seam, and that the bottom edge of the stretch panel must

5   attach at the first seam.  JCC Ex. 5 at 45-51 (February 6, 2018 claim amendment).  Instead, Claim 1

6   of the '496 patent was amended to use the new term "top location" to refer to the location where the

7   top edge of the stretch panel is attached to the front portion, and the new term "bottom location" to

8   refer to the location where the bottom edge of the stretch panel is attached to the front portion.  *Id.*;

9   *see also* '496 patent Claim 1.  Below is the redline of the key portion of this claim amendment

10   provided to the U.S. Patent and Trademark Office, highlighting the broadening change to the claim

11   language (JCC Ex. 5 at 46):

12              a stretch panel attached to the body inside the front portion, the stretch panel

13   comprising a sheet of elastically resilient four-way stretch material having a top edge attached

14   to the body at ~~the waistband seam~~ a top location, a bottom edge attached to the ~~first seam~~ body at

     a bottom location, side edges attached to the body at side seams extending substantially

15   continuously along ~~wither~~ either side of the front portion ~~from the first seam to the waistband~~

16   ~~seam~~ and an opening for receiving a wearer's genitals, the opening having a rounded bottom

17   edge and opposing side edges that are spaced apart from one another on either side of the

     opening;

18        Certain of Rampion's accused products are constructed such that the top edge of the stretch

19   panel is attached just below, rather than at, the waistband seam.  Accordingly, Rampion seeks to

20   rewrite Claim 1 of the '496 patent as if the amendment to the claim language never took place.

21   Rampion proposes exactly the same definition for "waistband seam" and "top location" (*see* JCC at

22   24, 86 ("The seam connecting the body of the male garment and the stretch panel to the

23   waistband")), and exactly the same definition for "first seam" and "bottom location" (*see* JCC at 28,

24   90 ("The seam connecting the crotch panel and the stretch panel to the front portion")).  In doing so,

25   Rampion conveniently ignores the fact that Claim 1 of the '496 patent was amended to be different in

26

1    scope from Claim 1 of the '030 patent, and the amended Claim 1 of the '496 patent was accepted and

2    approved by the U.S. Patent and Trademark Office.

3          No legal authority supports Rampion's effort to use claim construction to reverse an

4    amendment to the claim language made during prosecution.  To the contrary, a POSA familiar with

5    the claims, Specification, and prosecution history would readily understand that the language of

6    Claim 1 of the '496 patent was changed to differ from the language of Claim 1 of the '030 patent

7    because Claim 1 of the '496 patent was intended by the applicant and the examiner to have a

8    different, and broader, substantive scope.  *See Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d

9    1352, 1358 (Fed. Cir. 2004) (changes in claim language in later generations of patents in the same

10   family, from "predetermined time period" to "predetermined incubation period" and then to "suitably

11   stable endpoint," proved that later patents were intended to have a different, and broader, claim scope

12   than their predecessors).  The prosecution history confirms this understanding.  During prosecution

13   of the '496 patent, the patent examiner issued an office action that included a statutory double

14   patenting rejection, rejecting all claims (before amendment) because at that time they were identical

15   to the claims of the '030 patent.  BN3TH made its amendment to the claims, discussed above, on

16   February 6, 2018, in response to this office action.  By doing so it overcame this double patenting

17   rejection, confirming that the patent examiner understood (as a POSA reviewing the prosecution

18   history would understand) BN3TH's amendments to change the scope of the claims of the '496

19   patent to make them different from the claims of the '030 patent.  *See* JCC Ex. 5 at 45-51 (February

20   6, 2018 amendment and comments responding to double patenting rejection).  Withdrawal of a

21   statutory double patenting rejection after amendment establishes that there is a difference in scope

22   between the original and amended claims.  *See AstraZeneca AB v. Andrx Labs, LLC*, No. 14-8030,

23   2017 WL 111928, at *45 (D.N.J. Jan. 11, 2017).

24         Further, Rampion's mere copying of the constructions of "waistband seam" and "first seam"

25   as its proposed constructions for "top location" and "bottom location" makes Rampion's proposed

26   constructions inconsistent with the plain meaning of the claim language itself.  Contrary to

1  Rampion's proposed constructions, the plain meaning of "location" in top and bottom locations is a

2  place or region of the garment, not a "seam."  JCC Exs. 26-28 (dictionary definitions of "location" as

3  a region or place).  The plain meaning of top and bottom locations is consistent with BN3TH's

4  construction, as these terms refer to the region (location) where each of the top and bottom edges of

5  the stretch panel is attached.  JCC Ex. 29 (treatise *Patternmaking for Fashion Design* describing as

6  "top section" the entire upper part of a garment, not merely the top edge); *see also* JCC Exs. 23-25,

7  30-32 (defining "top" and "bottom" to include the highest and lowest points as well as the upper and

8  lower parts of an item).

9         Finally, Rampion's justification for its redrafting of Claim 1 of the '496 patent is erroneous as

10  a matter of law.  It is legal error to narrow claim language to import a feature of exemplary

11  embodiments as a requirement into claims that are written more broadly.  This is true even where *all*

12  or the *only* exemplary embodiments described and depicted in a patent's specification and figures

13  happen to share a feature not expressly required by the claim language.  *See InterDigital Commc'ns*,

14  690 F.3d at 1328 (holding that claim term "increased power level" covered step-wise power

15  increases, as well as continuous increases, even where the specification described the latter but not

16  the former); *id* at 1324 (holding that, since there was no definition of the term and no disavowal of

17  claim scope, the claim term "code" could not be limited to the examples described in the

18  specification); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013) ("'The patentee

19  is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or

20  import a limitation from the specification into the claims.'" (quoting *Kara Tech. Inc. v. Stamps.com*

21  *Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009))); *Rexnord*, 274 F.3d at 1343-44 (reversing district court's

22  claim construction that improperly limited scope of claims by importing feature shared by all

23  disclosed embodiments in specification).  Here, there is no basis upon which a POSA would read out

24  the amendments to Claim 1 of the '496 patent and rewrite the claims as Rampion suggests.

25  BN3TH's straightforward construction of top location and bottom location should be adopted.

26  **F.    "Substantially Continuously Along Either Side of the Front Portion" (JCC at 32-50)**

| BN3TH: Plain and ordinary meaning; *in the alternative:* each side seam attaches one side edge of the stretch panel to the inside of the front portion of the garment's body. | Rampion: largely, but not necessarily wholly, uninterrupted along the entire length of each side of the front portion. |
|---|---|

The context of the claim phrase "substantially continuously along either side of the front portion" is important, as taken out of context this phrase may be misleading. This phrase occurs in Claim 1 of each Asserted Patent, and applies to the seams that attach the two outer side edges *of the stretch panel* to the front portion. *See, e.g.,* '496 patent Claim 1 ("*a stretch panel* attached to the body inside the front portion, *the stretch panel comprising* . . . side edges attached to the body at side seams extending substantially continuously along either side of the front portion" (emphases added)). Rampion's proposed construction is inconsistent with the plain meaning of the claim language because it purports to require a seam running from the top to the bottom *of the front portion*, while the claim language is actually referencing a seam attaching the edge of the stretch panel to the front portion. (In other words, "substantially continuously" refers to the nature—not the length—of the stretch panel seam.) This distinction is critical, because this claim phrase is found in both Asserted Patents. As discussed above, the '496 patent only requires the stretch panel to extend vertically along a part of the front portion (from the top location to the bottom location), not all the way up and down the front portion. *See supra* Section III.E. Rampion's proposed construction would improperly shoe-horn a requirement inconsistent with the proper scope of top location and bottom location into the meaning of "substantially continuously along either side of the front portion."[6]

The Court could simply reject Rampion's inaccurate proposed construction (thus resolving the parties' dispute as to claim scope) and hold that this claim phrase carries its plain and ordinary meaning. If, however, the Court prefers to adopt a detailed construction of this phrase, BN3TH's proposed construction is consistent with the context and plain meaning of the claim language, and

---

[6] The first half of Rampion's construction, "largely, but not necessarily wholly, uninterrupted" is not on its own necessarily inaccurate or inconsistent with BN3TH's proposed construction, but as discussed in the preceding paragraph, the remainder of Rampion's proposed construction (purporting to require the seam to extend the entire length of the front portion, rather than the entire length of the stretch panel) is inaccurate and makes Rampion's construction as a whole misleading and inappropriate.

1    makes clear that the side seams at issue are located on the side edge of the stretch panel and attach

2    the stretch panel to either side of the inside of the front portion.  *See* JCC Exs. 33-36 (varied

3    definitions showing the breadth of the plain meaning of continuous/continuously include, for

4    example, "being in immediate connection or spatial relationship," "to hold together, retain," and

5    "having but one direction").  BN3TH's construction also comports with the Specification, which

6    repeatedly describes that side seams attach the side edge of the stretch panel to the inside of the front

7    portion of the garment's body.  *See, e.g.,* Spec. at 1:45-53, 2:59-60 ("Side edges of stretch panel 22

8    are joined to front portion 18 of body 14 along seams 29 on either side of front portion 19."); *see also*

9    JCC at 32-33 (citing and summarizing additional supporting discussion in the Specification).

10   **G.     "Crotch Panel" (JCC at 82-85)**

| **BN3TH:** Fabric separate from and joined to both the front portion and the back side of the garment's body, in the region that is adjacent to the wearer's crotch when the garment is worn. | **Rampion**: Plain and ordinary meaning. |
| --- | --- |

14          The parties' dispute over the claim phrase "crotch panel" mirrors their dispute over "stretch

15   panel," discussed above.  Rampion again seeks only a "plain and ordinary meaning" construction

16   without disclosing what Rampion contends that meaning actually is.  In contrast, BN3TH seeks to

17   construe this term for the assistance of a trier of fact that might not be familiar with it, and to make

18   clear that the "crotch panel" used in the Asserted Patents is required to be a separate fabric element

19   attached via seams to the front portion and back side of the underwear body in the region adjacent to

20   the wearer's crotch.  As with "stretch panel," Rampion's reliance on a plain meaning construction,

21   without detailing what that meaning is, only obscures a dispute between the parties over whether the

22   crotch panel is required to be a separate component of the body of the undergarment attached by

23   seams to the front portion and the back side of the body.  That dispute as to claim meaning and scope

24   must be resolved by the Court, despite Rampion's "plain and ordinary meaning" proposal.  *See O2*

25   *Micro*, 521 F.3d at 1360.

26

1       The context of the claim language requires that the "crotch panel" be a part of the body of the

2   men's undergarment composed of fabric separate from and joined to the front portion and back side

3   of the body.  *See, e.g.,* '030 patent Claim 1 ("the body including a crotch panel . . . joined to the front

4   portion along a first seam").  The Specification makes clear that the crotch panel is separate fabric

5   joined to both the front portion and the rear side of the body.  As discussed above, "panel" is used in

6   the garment design industry to denote a separate fabric piece in a garment.  *See* JCC Ex. 50

7   (examples of "panel" used consistently in industry treatise to denote a separate fabric piece joined to

8   other pieces to construct a garment).  More specifically, "crotch panel" is used in the undergarment

9   design field to denote a separate fabric element interposed in the crotch region between the front and

10  back panels of undergarments.  *See* JCC Ex. 47 (U.S. Patent No. 5,081,716 (Lehenbauer) at Figs. 1-

11  10, 2:8-18, 3:6-21).  For these reasons, BN3TH's construction is precisely how a POSA would

12  understand the plain and ordinary meaning of "crotch panel," and should be adopted.

13  **H.      "Asymmetrical Stretch Characteristics" (JCC at 63-65)**

| BN3TH: The amount of stretch of the fabric produced when force is applied in one direction differs from the amount of stretch produced when the same amount of force is applied to the fabric in a different direction. | Rampion: Indefinite. |
|---|---|

17      Rampion argues that dependent Claim 2 of the Asserted Patents is invalid because the claim

18  phrase "asymmetrical stretch characteristics" is indefinite and would not be understood sufficiently

19  by a POSA in light of the intrinsic evidence.  *See* JCC at 63 (Rampion's position).  Rampion argues

20  indefiniteness even though that the Specification *expressly defines* "asymmetrical stretch

21  characteristics."

22          In some embodiments, the material of stretch panel 22 has asymmetrical stretch (i.e.
23      the coefficient of elasticity of the material has a first value in a first direction in the
        plane of the material and a second value different from the first value in a second
24      direction at right angles to the first direction in the plane of the material).  The
        material may be oriented that it is easier to stretch the material of stretch panel 22 in a
25      direction parallel to waistband 12 than it is to stretch the material in a direction
        perpendicular to waistband 12.

26

1   Spec. at 5:8-16.  Rampion bears the burden to **prove** indefiniteness of any asserted patent claims—

2   claims, and not claim phrases, are definite or indefinite—by clear and convincing evidence.  *Sonix*

3   *Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017) (patent claims not

4   proven indefinite).  A patent claim is not indefinite unless it "fail[s] to inform, with reasonable

5   certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig*

6   *Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "Determining whether a claim is definite requires an

7   analysis of whether [a POSA] would understand the bounds of the claim when read in light of the

8   specification. . . .  If the claims read in light of the specification reasonably apprise those skilled in

9   the art of the scope of the invention, § 112 demands no more." *Personalized Media Commc'ns, LLC*

10  *v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) (internal quotation marks and citation

11  omitted; ellipsis in original); *Cal. Inst. of Tech. v. Hughes Commc'ns Inc*., 35 F. Supp. 3d 1176, 1194

12  (C.D. Cal. 2014) (post-*Nautilus* holding that just because "a term covers broad possibilities does not

13  render it indefinite, as long as a [POSA] can identify the outer boundaries, expansive though they

14  may be"); *dunnhumby USA, LLC v. emnos USA Corp.*, No. 13-CV-0399, 2015 WL 1542365, at *14

15  (N.D. Ill. Apr. 1, 2015) (holding that the intrinsic record adequately defined objective boundaries as

16  to the scope of "query template" even though the record did not limit the methods or media for

17  creating the query template).

18      Here, there can be no dispute about whether a POSA would understand the meaning of the

19  claim term "asymmetrical stretch characteristics," because the meaning of that term is called out in

20  the Specification, quoted above.  *See* Spec. at 5:8-16; see also JCC Ex. 3 at 85-86 (Jan. 9, 2014 office

21  action) (discussing materials that stretch only left-right or only up-down).  BN3TH's proposed

22  construction rephrases this somewhat technical definition in language that is intended to be more

23  accessible to the trier of fact, and consistent with the example application of the term (also quoted

24  above) that follows the definition in the Specification.

25      Conversely, Rampion has offered no **evidence** to meet its burden to prove by clear and

26  convincing evidence that a POSA, despite the express definition in the Specification and the example

1    in the Specification applying that definition, would somehow not understand the meaning of

2    "asymmetrical stretch characteristics."

3          At a minimum, in the absence of any ***evidence*** of indefiniteness and in the face of an express

4    definition, there is no basis at the *Markman* stage, without full expert reports, discovery, and briefing,

5    for a finding of indefiniteness, particularly under the applicable heightened standard of proof. *CSB-*

6    *Sys. Int'l Inc. v. SAP Am., Inc.*, No. 10–2156, 2011 WL 3240838, at *20 n.16 (E.D. Pa. July 28,

7    2011) ("[T]he weight of the jurisprudence disfavor[ed] indefiniteness determinations at the *Markman*

8    stage of patent litigation.").[7]

9          BN3TH's construction should be adopted because it follows the express definition in the

10   Specification, but in language more accessible to the jury.

11   **I.     "Rectangular" (JCC at 65-68)**

12   | **BN3TH:** An exterior outline with four corners and with one pair of edges significantly longer than the opposing pair of edges. | **Rampion**: The shape of a rectangle. |
13   | --- | --- |

14         Fundamentally, the parties dispute whether the term "rectangular," as used in dependent

15   Claim 3 of each Asserted Patent to describe the shape of the stretch panel, requires a precise

16   geometric "rectangle" (*i.e.*, four square corners and two sets of straight, parallel sides), as Rampion

17   asserts, <u>or</u> can apply to a shape reminiscent of a rectangle, as BN3TH asserts.  JCC at 65-68.

18   BN3TH's construction is consistent with the intrinsic and extrinsic evidence and the experience of a

19   POSA used to working with pieces of fabric that stretch and do not always maintain their original

20   shape with absolute perfection.  In contrast, Rampion's construction appears to be based on selective

21   designation of general-purpose dictionary definitions, even though it is flatly inconsistent with the

22   Specification.

23

24   [7] *See also Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The]
25   indefiniteness argument is inappropriate at the claim construction stage."); *Adapt Pharma Operations Ltd. v. Teva Pharm. USA, Inc.*, No. 16-7721 et al., 2019 WL 1789463, at *4 (D.N.J. Apr. 24, 2019) (similar); *Cacace v. Meyer Mktg. (Macau
26   Commercial Offshore) Co.*, 812 F. Supp. 2d 547, 560 (S.D.N.Y. 2011) (proof of indefiniteness requires evidence, not attorney argument, and thus is better suited to the summary judgment context).

1    The plain, ordinary meaning of "rectangular" is broad enough to include *both* shapes that are
2    strict geometric rectangles, and real-world shapes that bring to mind a rectangle because of some
3    similarity to a rectangle, thus supporting BN3TH's construction rather than Rampion's.  *See* JCC
4    Exs. 46-47, 58-61 (each including some variation on "shaped like a rectangle").  Uses of
5    "rectangular" in the garment industry apply to shapes that are not actual geometric rectangles but
6    bring to mind a rectangle because they resemble the shape of a rectangle.  *See* JCC Ex. 45 (the
7    industry treatise and textbook *Patternmaking for Fashion Design*) (including examples of
8    "rectangular" used to describe shapes that are clearly not literal geometric rectangles, such as the
9    body shape of some persons, the profile of certain skirts, and the shape of certain jean pockets).  That
10   is precisely how the Specification uses "rectangular," including describing the stretch panel of the
11   embodiment of the invention shown in Figs. 1-8 as rectangular.  *See* Spec. at 4:25-38, 4:44-49.

12       Further, the Specification recognizes that the stretch panel of this embodiment is ***not*** an
13   absolute geometric rectangle, but is only similar to a rectangle in shape, because, for example, its top
14   and bottom (shorter) sides are not equal in length to one another (and thus none of its corners are
15   actually square).  Spec. at 4:44-49.  Thus, if Rampion's construction requiring a rectangular shape to
16   be "the shape of a rectangle" was adopted, the very example of a rectangular stretch panel identified
17   as a *preferred embodiment* in the Specification would be excluded from the scope of "rectangular" in
18   the claims.  Such a construction that reads out the preferred embodiment is legal error.  *Epos Techs*,
19   766 F.3d at 1347 (reversing district court's construction "because it reads out preferred
20   embodiments"); *Vitronics*, 90 F.3d at 1583 (a claim construction so narrow as to exclude the
21   principal preferred embodiments "is rarely, if ever, correct and would require highly persuasive
22   evidentiary support").

23       BN3TH's construction is consistent with the examples in the Specification, and the full
24   breadth of the plain meaning of "rectangular" to a POSA in the garment industry.  It should be
25   adopted over Rampion's proposed construction, which would exclude the preferred embodiment
26   contrary to the Specification.

1  **J.     "A Dart Seam Stitched Along a Bottom Portion of the Pouch" (JCC at 68-70)**

| **BN3TH:** A shaping seam where material has been folded or removed to provide three-dimensional shaping or space, where the seam is stitched along a bottom portion of the pouch. | **Rampion:** An <u>additional seam</u> present along the bottom portion of the front portion <u>but not along the top portion of the front portion</u>. (emphases added) |
| --- | --- |

The phrase "a dart seam stitched along a bottom portion of the pouch" is found in dependent

Claim 15 each Asserted Patent, which provides: "A garment according to claim 1 wherein the pouch

comprises a dart seam stitched along a bottom portion of the pouch and substantially centrally to

provide extra volume in front of and underneath the genitals of a wearer."  BN3TH's proposed

construction of the phrase "a dart seam stitched along a bottom portion of a pouch"[8] is true to the

plain and ordinary meaning of the language in the context of the surrounding claim language.

BN3TH's construction is consistent with the plain meaning of the technical garment design

term "dart seam" because it requires a ***shaping*** seam where material is removed or folded over.  *See*

JCC Exs. 48-49 (technical treatise discussion of dart seams and relevant treatise glossary entries).

BN3TH's construction is also consistent with the surrounding claim language and the discussion of

dart seams in the Specification and prosecution history, in that it requires the dart seam to be present,

at least, in the bottom portion of the pouch.  *See* JCC at 68-69 (citing and summarizing discussion of

dart seams in intrinsic record).

Dart seams are a well-understood method of adding shape to a garment to create a contoured

three-dimensional shape, including to fit over a convex protrusion of the body (*e.g.*, the bust in a

women's top or a pouch in men's underwear).  *See* JCC Ex. 48 at 199 (glossary entries, including for

"darts," "dart equivalents," and "dart manipulation").  This can be done by folding over or removing

a wedge-shaped section of material at a seam, referred to as a dart seam, which provides three-

dimensional shaping to an otherwise relatively flat fabric panel.  *Id.*  It is well understood in the

garment design art that dart seams can be moved to different positions around the central point of the

---

[8] "Pouch" is a claim term the parties separately identified for construction, and as to which the parties have reached an agreed upon construction.  *See* ECF No. 47.

1    bodily protrusion being fitted, and can be made either as a single dart, a series of tucks, or a styleline

2    seam, so long as the same amount of material in total is removed around the central point of the

3    protrusion.[9]  JCC Ex. 49 (treatise *Patternmaking for Fashion Design*); *see also* JCC Ex. 48 at 199

4    ("Dart intakes may be converted into stylelines . . . with the fit of the garment maintained.")

5    BN3TH's proposed construction is consistent with this well-established meaning of "dart seam," and

6    also comports with the surrounding claim language requiring the dart seam to be stitched at least in

7    the bottom portion of the pouch.  *See* '030 patent Claim 15; '496 patent Claim 15.

8        In contrast, Rampion's proposed construction is in part too broad, because it applies to ***any***

9    "additional seam," without requiring that such a seam involve folding over or removing a wedge-

10   shaped piece of fabric so as to change the three-dimensional fit of the garment.  This is directly

11   contrary to the plain and ordinary meaning of "dart seam," which requires folding over or removal of

12   such a wedge/dart-shaped piece of fabric to give the garment three-dimensional shape.  JCC Exs. 48-

13   49; *see also* JCC Ex. 49 at 168 (distinguishing between styleline seams that do and do not function as

14   dart seams, depending on whether fabric is removed and whether the seam passes through a dart

15   point).[10]  Rampion's proposed construction is also incomplete and confusing, because it does not

16   explain what the "additional seam" is in addition to.  For these reasons alone, Rampion's proposed

17   construction is inadequate.

18       As underlined above, Rampion also inserts into its proposed construction the phrase "but not

19   along the top portion of the front portion," effectively rewriting the claim language to require that the

20   dart seam be stitched ***only*** in the bottom portion of the pouch.  This additional limitation has no basis

21   in the plain meaning of the claim language or in the Specification.  Claim 15 provides that the

22   "pouch" of the garment "comprises" a dart seam stitched along the bottom portion of the pouch.  As

---

23   [9] The figures of both Asserted Patents (*e.g.*, item 19 in '030 patent Figs. 1-4) show dart seams from the inside and outside

24   with the excess material removed, rather than folded over (no folding over is shown on either the front or back side of the
     seam).  As such, both parties' proposed constructions, consistent with this disclosed exemplary embodiment, are broad

25   enough to include dart seams where the excess material is removed.  *See* JCC Ex. 48 at 199 (seam with wedge-shaped
     piece of material removed functions as a dart); JCC Ex. 49 at 168 (similar); JCC at 68 (parties' competing constructions).

26   [10] Rampion's proposed construction is also inconsistent with the dictionary definitions that Rampion cites.  *See* JCC Exs.
     58-61 (requiring folding over or removal of wedge-shaped piece of fabric to make a seam a "dart seam").

1    the Court is well aware, "comprises" is a patent claim legal term of art, which means "including or

2    having, *but not exclusively*. . . . This term does not limit the claim to the specified elements, so a later

3    patent applicant's product or process cannot avoid infringement by merely adding another claim

4    element. Hence a claim reciting 'a widget comprising A and B,' for example, is infringed by any

5    widget that includes A and B, even if C, D, or E might be present." *Comprising, Black's Law*

6    *Dictionary* (10th ed. 2014) (emphasis added) (citing *Amgen Inc. v. Hoechst Marion Roussel, Inc.*,

7    314 F.3d 1313, 1344–45 (Fed Cir. 2003) ("'Comprising is a term of art used in claim language which

8    means that the named elements are essential, but other elements may be added and still form a

9    construct within the scope of the claim.'" (citation omitted))).  Thus, a pouch with a dart seam

10   stitched in both its top portion and its bottom portion is still a pouch that "comprises a dart seam

11   stitched along a bottom portion of the pouch."  For this independent reason, Rampion's proposed

12   construction is legally improper and should be rejected.

13   **IV.    CONCLUSION**

14          For the reasons discussed above, BN3TH's proposed constructions of the disputed claim

15   terms should be adopted, and Rampion's proposed constructions rejected.

16   RESPECTFULLY SUBMITTED: May 24, 2019.

17                                    STOEL RIVES LLP
                                      */s/ Brian C. Park*
18                                    Brian C. Park, WSBA No. 25584
                                      600 University Street, Suite 3600
19                                    Seattle, WA  98101-4109
                                      Telephone: (206) 386-7542
20                                    Facsimile:  (206) 386-7500
                                      Email:  brian.park@stoel.com
21                                    */s/ Steven T. Lovett*
                                      Steven T. Lovett (admitted *pro hac vice*)
22                                    steve.lovett@stoel.com
                                      */s/ Nathan C. Brunette*
23                                    Nathan C. Brunette (admitted *pro hac vice*)
                                      nathan.brunette@stoel.com
24                                    760 S.W. Ninth Avenue, Suite 3000
                                      Portland, OR  97205
25                                    Telephone:  (503) 224-3380
                                      Facsimile:   (503) 220-2480
26                                    Attorneys for Plaintiffs

1                                   **<u>CERTIFICATE OF SERVICE</u>**

2          I hereby certify that I served the foregoing **PLAINTIFFS' OPENING CLAIM**

3   **CONSTRUCTION BRIEF** on the following named person(s) on the date indicated below by

4          ¨      mailing with postage prepaid

5          ¨      hand delivery

6          ¨      facsimile transmission

7          ¨      overnight delivery

8          ¨X    CM/ECF notification

9

10   Paul Meiklejohn
       meiklejohn.paul@dorsey.com
       Erin Kolter

11   kolter.erin@dorsey.com
       Dorsey & Whitney LLP

12   701 Fifth Avenue, Suite 6100
       Seattle, WA 98104

13
       Attorneys for Defendants

14
       DATED: May 24, 2019.

15

16                                   *<u>/s/ Brian C. Park</u>*

17                                   Brian C. Park, WSBA No. 25584
                                  Steven T. Lovett (admitted *pro hac vice*)

18                                   Nathan C. Brunette (admitted *pro hac vice*)

19                                   Attorneys for Plaintiffs

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE (101938117.2 0068561-00001) - 1