1      THE HONORABLE JAMES L. ROBART

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON
8                           AT SEATTLE

9    0912139 B.C. LTD., a Canadian corporation,        No. 2:18-cv-01464-JLR
     and PAKAGE APPAREL INC., a Canadian
10   corporation,                                       PLAINTIFFS' RESPONSIVE CLAIM
                                                        CONSTRUCTION BRIEF
11                         Plaintiffs,
                                                        Claim Construction Hearing:  July 12, 2019
12            v.

13   RAMPION USA INC., a Washington
     corporation, and RAMPION ENTERPRISES
14   LTD., a Canadian corporation,

15                         Defendants.

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF
(102137746.3 0068561-00001)

1

**TABLE OF CONTENTS**

2
**PAGE**

3   TABLE OF AUTHORITIES ...........................................................................................ii

4   I.    ARGUMENT ....................................................................................................1

5         A.    Rampion Improperly Seeks to Import Features of Exemplary Embodiments
                to Narrow the Plain Meaning of "Front Portion." .........................................2
6
7         B.    A POSA Would Understand the Prosecution History to Indicate that Top
                Location and Bottom Location Are Not Limited to the Waistband Seam and
8               First Seam ...............................................................................................6

9         C.    "A Dart Seam Stitched Along a Bottom Portion of the Pouch" Requires a
                "Dart" Seam, Not Any Seam, and Does Not Prohibit a Dart Seam Elsewhere
10              in the Pouch ...............................................................................................9

11        D.    "Gathered from Side-to-Side and Top-to-Bottom by the Stretch Panel" Means
                Drawn Up to Form a Pouch and Cannot Mean "Puckered," as That Would
12              Read Out All Preferred Embodiments ...........................................................11

13        E.    "Substantially Continuously Along Either Side of the Front Portion" Does
                Not Re-Write the Definition of Top Location and Bottom Location .....................13
14
15        F.    Asymmetrical Stretch Characteristics .........................................................16

16        G.    "Stretch Panel" and "Crotch Panel" Refer to Separate Panels of Material ...........17

17              1.    "Stretch Panel" ...............................................................................18

18              2.    "Crotch Panel" ...............................................................................19

19        H.    The Specification Teaches and the Preferred Embodiments Require that
                "Rectangular" Is Not Limited to Perfect Geometric Rectangles .........................21

      II.   CONCLUSION .................................................................................................24

20

21

22

23

24

25

26

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

## TABLE OF AUTHORITIES

2

**PAGE**

3    **Cases**

4    *AFG Indus., Inc. v. Cardinal IG Co., Inc.,*
        239 F.3d 1239 (Fed. Cir. 2001)............................................................................................ 1
5

6    *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
        340 F.3d 1293 (Fed. Cir. 2003)..........................................................................................22

7    *Ariad Pharm., Inc. v. Eli Lilly & Co.,*
        598 F.3d 1336 (Fed. Cir. 2010) (en banc) .......................................................................... 9
8

9    *Clare v. Chrysler Group LLC,*
        819 F.3d 1323 (Fed. Cir. 2016)............................................................................................ 7
10

     *Control Resources, Inc. v. Delta Electronics, Inc.,*
11       133 F. Supp. 2d 121 (D. Mass. 2001) .................................................................................. 1

12   *Cox Communications, Inc. v. Sprint Communication Co.,*
        838 F.3d 1224 (Fed. Cir. 2016)..........................................................................................17
13

     *Denneroll Holdings Pty Ltd. v. Chirodesign Group, LLC,*
14       No. 4:15-CV-740, 2016 WL 705207 (S.D. Tex. Feb. 23, 2016) .......................................22

15   *Epos Techs. Ltd. v. Pegasus Techs. Ltd.,*
        766 F.3d 1338 (Fed. Cir. 2014)....................................................................................12, 21
16

17   *General Electric Co. v. International Trade Commission,*
        685 F.3d 1034 (Fed. Cir. 2012)....................................................................................22, 23
18

     *Hologic, Inc. v. Smith & Nephew, Inc.,*
19       884 F.3d 1357 (Fed. Cir. 2018)............................................................................................ 9

20   *Howmedica Osteonics Corp. v. Zimmer,*
        822 F.3d 1312 (Fed. Cir. 2016)..........................................................................................11
21

     *Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc.,*
22       No. C16-0341JLR, 2017 WL 6550700 (W.D. Wash. Dec. 21, 2017) ................................8, 13, 17

23   *Intellicheck Mobilisa, Inc. v. Wizz Sys., LLC,*
        173 F. Supp. 3d 1085 (W.D. Wash. 2016) .......................................................................... 7
24

25   *Koninklijke Philips Elecs. NV v. Defibtech LLC,*
        No. C03–1322JLR, 2005 WL 3500783 (W.D. Wash. Dec. 21, 2005) ...............................23

26

**TABLE OF AUTHORITIES**

PAGE

*Lucent Techs., Inc. v. Gateway, Inc.,*
   525 F.3d 1200 (Fed. Cir. 2008).................................................................................23

*Medtronic Vascular Inc. v. Advanced Cardiovascular Sys., Inc.,*
   No. C 06-1066 PJH, 2007 WL 4557794 (N.D. Cal. Dec. 21, 2007)............................22

*Motorola Mobility, Inc. v. Microsoft Corp.,*
   No. C11-1408JLR, 2012 Wl 13065775 (W.D. Wash. Aug. 9, 2012) ...............................3, 7, 8, 13

*Nat'l Prods., Inc. v. Arkon Res., Inc.,*
   No. C15-1984JLR, 2018 WL 4403328 (W.D. Wash. Oct. 2, 2017)...............................7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,*
   521 F.3d 1351 (Fed. Cir. 2008)..............................................................................18, 23

*Oakwood Energy Mgmt., Inc. v. Le,*
   No. 02–74730, 2003 WL 25784783 (E.D. Mich. Nov. 6, 2003)..................................22

*Old Town Canoe Co. v. Glenwa, Inc.,*
   55 F. App'x 918 (Fed. Cir. 2003) ................................................................................3

*Ormco Corp. v. Align Tech., Inc.,*
   498 F.3d 1307 (Fed. Cir. 2007).....................................................................................3

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)...................................................................8, 18, 21, 23

*REC Software USA, Inc. v. Bamboo Sols. Corp.,*
   No. C11–0554JLR, 2012 WL 1533965 (W.D. Wash. Apr. 30, 2012).........................15

*Rexnord Corp. v. Laitram Corp.,*
   274 F.3d 1336 (Fed. Cir. 2001).....................................................................................3

*SanDisk Corp. v. Memorex Prods., Inc.,*
   415 F.3d 1278 (Fed. Cir. 2005)...................................................................................10

*Skedco, Inc. v. Strategic Operations, Inc.,*
   685 F. App'x 956 (Fed. Cir. 2017) ...............................................................................3

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,*
   844 F.3d 1370 (Fed. Cir. 2017)...................................................................................16

*Sulzer Textil A.G. v. Picanol N.V.,*
   358 F.3d 1356 (Fed. Cir. 2004)...............................................................................1, 19

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1

## TABLE OF AUTHORITIES

2
**PAGE**

3   *Timeline, Inc. v. Proclarity Corp.,*
        No. C05–1013JLR, 2006 WL 6143242 (W.D. Wash. June 29, 2006)...........................................13
4

5   *Trading Techs. Int'l, Inc. v. eSpeed, Inc.,*
        595 F.3d 1340 (Fed. Cir. 2010)......................................................................................................9

6
    *U.S. Surgical Corp. v. Ethicon, Inc.,*
7       103 F.3d 1554 (Fed. Cir. 1997)....................................................................................................15

8   *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,*
        141 F.3d 1084 (Fed. Cir. 1998)......................................................................................................3
9

    **Statutes**
10
    35 U.S.C. § 112..............................................................................................................................8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF - iv
(102137746.3 0068561-00001)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*

1
I.       **ARGUMENT**

2
        The purpose of claim construction is to arrive at a wording that explains for a lay jury

3
how a person of ordinary skill in the art ("POSA") would understand a claim term  <u>in</u>

4
<u>context</u>.  *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004).  Claim

5
constructions must be drafted using language that will be understandable to a lay jury, because

6
they eventually become part of the jury instructions in a patent case.  *AFG Indus., Inc. v.*

7
*Cardinal IG Co., Inc.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) (clear ruling construing claims and

8
resolving disputes as to claim scope are a duty of the district court, as they become part of the

9
jury instruction); *Control Resources, Inc. v. Delta Electronics, Inc.*, 133 F. Supp. 2d 121, 127 (D.

10
Mass. 2001) ("In the end, claim construction must result in a phraseology that can be taught to a

11
jury of lay people….  The claims must be translated into plain English so that a jury will

12
understand.").  Like any instruction to the jury, a claim construction may need to use sentences

13
to explain to a lay jury a concept that specialists in the field summarize and reference in just a

14
few words.  *See, e.g.,* Ninth Circuit Model Civil Jury Instruction No. 1.7 (extended explanation

15
of phrase "clear and convincing evidence"); Northern District of California Model Patent Jury

16
Instruction 4.3b (extended discussion explaining to jury statutory term "obvious").

17
        With this goal in mind, Plaintiffs ("BN3TH") propose constructions based on the plain and

18
ordinary meaning of the claim language to a POSA at the time of the invention, in view of the

19
Specification and consistent with the prosecution history.  In response, Defendants ("Rampion"),

20
with little support for their strained constructions, resort to criticizing BN3TH's constructions for

21
using more words than the term or phrase being construed, though Rampion cites no authority

22
suggesting such criticism is valid.  BN3TH's proposed constructions accurately describe the

23
meaning of the disputed term to a POSA, in a way the jury can understand and apply without

24
confusion.  The number of words used to accomplish that goal is irrelevant.

25

26

**A.      Rampion Improperly Seeks to Import Features of Exemplary Embodiments to Narrow the Plain Meaning of "Front Portion."**

| BN3TH: Region of the garment's body that is situated in front of the wearer when the garment is worn and to which the stretch panel is attached to form a concave space between the front portion and the stretch panel capable of receiving the wearer's genitals | Rampion: The **outermost layer of fabric** of the body of the male garment bounded by the side seams, waistband seam, and first seam. |
|---|---|

The plain and ordinary meaning of "front portion" is clear and readily understood in the context of men's undergarments.  The "front portion" is the region of the garment's body that is ***situated in front of the wearer*** when the garment is worn (in contrast, for example, the "back side" of the garment's body described in the Specification but not called out in the claims would be the region positioned *behind* the wearer).  Unlike ordinary underwear, the undergarment of the invention includes a stretch panel attached inside of the front portion that pulls and shapes at least a part of the front portion into a concave space (pouch) between the stretch panel and front portion capable of receiving the wearer's genitals.  U.S. Patent No. 9,687,030 ("the '030 patent") Claim 1; U.S. Patent No. 10,034,496 ("the '496 patent") Claim 1.  This straightforward and practical understanding of the "front portion" of the body of the undergarment is fully consistent not just with the plain meaning of the claim language, but, as discussed in BN3TH's opening brief, also with (1) the Specification, (2) the prosecution history, and (3) the ordinary use of "front" and "front portion" in the field (and the English language).  *See* ECF No. 49 ("P.CC.Br.") at 4-8 (citing and discussing intrinsic and extrinsic evidence).  Critically, the Specification and prosecution history demonstrate that the "front portion" can include multiple layers of fabric. Spec. at 2:34-48 (contemplating multiple layer front portion to provide for a fly opening); ECF No. 47-1 (JCC) Ex. 3 at 63-64 (Oct. 25, 2013 Resp. to Office Action) (describing "front portion" involving two-layer fabric construction).

In contrast, Rampion seeks a construction that would introduce legal errors to narrow and obscure this plain meaning.  The term used in Claim 1 of each Asserted Patent is "front portion"—not (unlike Defendants' suggestion) "front panel" or "front layer."  First, Rampion

1   seeks to limit the "front portion" of the body of the undergarment to only the "***outermost layer of***

2   ***fabric***" of the body.  Tellingly, Rampion devotes only a single paragraph of its opening brief to

3   this unsupported limitation.  ECF No. 48 ("R.CC.Br.) at 2-3.  Rampion asserts that (A) the

4   Specification and (B) the prosecution history support this narrowing construction of "front

5   portion."  In doing so, Rampion gets precisely backwards the legal analysis of the claim

6   language and specification discussion.  The correct legal analysis starts with the full plain and

7   ordinary meaning of the claim language, and asks whether anything in the specification or

8   prosecution history expressly or implicitly ***requires*** narrowing that meaning.  *See Vehicular*

9   *Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1089 (Fed. Cir. 1998) (the starting point

10  for claim construction are the claims themselves); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d

11  1336, 1343-44 (Fed. Cir. 2001) (reversing district court's claim construction that improperly

12  limited scope of claims by importing feature shared by *all* disclosed embodiments in

13  specification); *see also* P.CC.Br. at 5-6 (citing additional Federal Circuit cases).  The Federal

14  Circuit has repeatedly warned against confining claims solely to disclosed embodiments. *Ormco*

15  *Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007); *see also Motorola Mobility, Inc. v.*

16  *Microsoft Corp.*, No. C11-1408JLR, 2012 Wl 13065775, at *16 (W.D. Wash. Aug. 9, 2012)

17  (absent clear disavowal of claim scope, claims must not be restricted to features of exemplary

    embodiments or specification drawings).[1]

18  Citing no legal precedent for its approach, D.CC.Br. at 2-3, Rampion skips any analysis of

19  the plain meaning of the claim language and instead beings by assuming that the scope of the claim

20  term "front portion" is ***limited to the features of exemplary embodiments*** discussed and depicted in

21  the Specification and its figures.[2]  Rampion thus asserts that merely because the Specification does

22  not clearly say one way or the other whether the "front portion" in the exemplary embodiments

23  _____

24  [1] Rampion cites *Old Town Canoe Co. v. Glenwa, Inc.*, 55 F. App'x 918, 921 (Fed. Cir. 2003) (nonprecedential), with respect to this very claim term, for the proposition that broader claim language should not be narrowed by importing features of mere exemplary embodiments.  D.CC.Br. at 5.

25  [2] As the Federal Circuit has explained, "[t]his approach gets our precedent backwards.  'It is the *claims,* not the written description, which define the scope of the patent right.'  Patents do not need to include drawings of particular

26  embodiments in order to claim them." *Skedco, Inc. v. Strategic Operations, Inc.*, 685 F. App'x 956, 960 (Fed. Cir. 2017) (nonprecedential) (emphasis in original; brackets omitted).

1    described and depicted has one layer of fabric or more than one, somehow only the outer layer (if

2    there is more than one layer) can be the "front portion."  *See* D.CC.Br. at 2-3 ("The specification

3    does not disclose that the front portion consists of more than a single layer of fabric . . . .").

4         Rampion's argument also misconstrues the discussion of the front portion that appears in

5    the Specification.  Rampion contends that the Specification shows the front portion as consisting

6    only of a "single layer," but that language and concept comes from Rampion's briefing—not from

7    the Specification itself.  Neither the Specification figures Rampion cites, nor any other portion of

8    the Specification indicates how many layers of fabric are used in the front portion of those

9    embodiments.  *See* D.CC.Br. at 2-3 (citing only Spec. Figs. 1-4).  The Specification is clear that

10   all layers that are present in any embodiment (whether one or more layers) are included in the

11   scope of the term "front portion."  In fact, Arrows identifying the "front portion" (item 18) in

12   Figs. 1-8 point to both the *inside* surface (through the aperture in the stretch panel) and the outside

13   surface of the "front portion" material as comprising the "front portion."  *See* P.CC.Br. at 6-7.

14   Thus, the Specification is consistent with BN3TH's proposed construction—any and all layers of

15   fabric present in the front region of the garment's body comprise part of the claimed "front

16   portion," not just the outermost layer.  Nothing in the Specification requires narrowing the plain

17   meaning of "front portion" to just the "outermost layer" of the "front portion" as Rampion insists.

18        Second, Rampion also errs in asserting that the prosecution history supports narrowing

19   "front portion" to mean only the "outermost layer" of the "front portion."  D.CC.Br. at 3-5.[3]  Even

20   if Rampion's characterization of the amendment history was correct, nothing about amending

21   Claim 1 of what became the '030 patent to add the requirement that side edges *of the stretch panel*

---

22   [3] Rampion's characterization of the written summary of the October 22, 2013 interview during prosecution of the

23   '030 patent is inaccurate and relies on a partial quotation.  The summary notes that the examiner and applicant

     discussed a variety of different amendments, including to "include language detailing the automatic fit of the

24   undergarment in relation to the stretch panel and pouch."  Ex. 3 at 78.  The potential amendment that Rampion calls

     out, regarding the absence of an opening in an outer layer of the front portion, was not agreed to by the applicant

25   during the call, and the applicant did not make such an amendment thereafter.  Instead, the applicant made other

     amendments consistent with the summary, including a different amendment (adding the language quoted above) that

26   distinguished the specific structure for a fly that was used in the Reis reference, without excluding from the claim

     scope *all* structures that would include a fly opening in the front portion (such as an opening between two layers of

     the front portion, as implemented in Rampion's accused products).  Ex. 3 at 58-70.

1  be attached to the garment's body "at side seams extending substantially continuously"  along

2  either side of the front portion in any way suggests that the *front portion* was somehow being

3  narrowed to mean only the outside layer of fabric in the front portion of the body.  If that is what

4  the patentee had intended to do, the claim amendment would have specifically referenced the outer

5  layer of the front portion or of the body.  No such language was added to the claims.  To the

6  contrary, the very same Office Action response expressly asserts that a "front portion" can include

7  a structure made from two layers (and inner and outer layer of fabric), establishing that the patentee

8  at the time of this amendment did not intend to narrow "front portion" to mean only the outer layer

9  of fabric.  *See* JCC Ex. 3 at 63-65; *see also* P.CC.Br. at 6.

10       Rampion also asserts, in conclusory fashion, that the "front portion" must be limited in

11  width to the area directly in front of the stretch panel, and cannot extend laterally outside the side

12  seams where the stretch panel is attached to the inside of the garment's body.  D.CC.Br. at 3-5.

13  That limitation is only a lawyer argument.  The plain and ordinary meaning of the "front" of a

14  garment, including men's shorts, typically refers to the whole region of the garment disposed in

15  front of the wearer, not just a small part of that region as Rampion contends.  *See* JCC Ex. 8 at

16  124; *see also* JCC Ex. 8 at 85, 145, 160-61; P.CC.Br. at 5, 7-8 & n.3.

17       Nothing in the Specification narrows the "front portion" to just the area between the

18  seams at the side edges of the stretch panel.  While that *part* of the "front portion" that is

19  between the stretch panel side seams does get "gathered" into a "pouch" shape by attachment to

20  the stretch panel, the Specification's description is entirely consistent with the "front portion"

21  also including a broader area extending beyond the edges of the stretch panel.  Indeed, the

22  Specification describes Fig. 4 as showing the "front portion" —specifically, Fig. 4 includes

23  material that extends laterally beyond the seams at the side edges of the stretch panel, confirming

24  that the front portion need not end at the stretch panel side seams.  Spec. at 2:12 & Fig. 4.  While

25  Rampion argues that the "side seams" described in Claim 1 of each Asserted Patent define the

26  sides *of the front portion,* the claim language describes the side seams as attaching the side edges

    of the *stretch panel*, and merely as extending on either side of center of the "front portion" (not

1  necessarily at the outside *edges* of the front portion).  *E.g.*, '496 patent Claim 1 ("the **stretch**

2  **panel** comprising a sheet of elastically resilient four-way stretch material **having . . . side edges**

3  attached to the body at side seams extending substantially continuously along either side of the

4  front portion" (emphases added)).[4]

5  **B.     A POSA Would Understand the Prosecution History to Indicate that Top Location and Bottom Location Are Not Limited to the Waistband Seam and First Seam.**

6

| **BN3TH:** Top Location:  Plain and ordinary meaning; *in the alternative:*  region where the top edge of the stretch panel is attached to the front portion of the body of the garment. | **Rampion**: Top Location: The seam connecting the body of the male garment and the stretch panel to the waistband. |
| --- | --- |
| **BN3TH:** Bottom Location: Plain and ordinary meaning; *in the alternative:*  region where the bottom edge of the stretch panel is attached to the front portion of the body of the garment. | **Rampion**: Bottom Location: The seam connecting the crotch panel and the stretch panel to the front portion. |

7

8

9

10

11          As discussed in BN3TH's opening brief, the '496 patent started with a set of claims

12  identical to the application that became the '030 patent, but those claims were amended in

13  prosecution to be different in scope from the claims of the '030 patent.  The key change to

14  independent Claim 1 of the '496 patent was to use the new terms "top location" and "bottom

15  location" in place of "waistband seam" and "first seam" in describing where the top and bottom

16  edges of the stretch panel attach inside the body of the undergarment.  This change *broadened*

17  the claims to allow the top edge of the stretch panel to attach at a "top location" that might not be

18  precisely at the "waistband seam" and to allow the bottom edge of the stretch panel to attach at a

19  "bottom location" that might not be precisely at the "first seam."  A blackline of the relevant

20  claim language submitted during prosecution of the '496 patent leaves no doubt about what was

21  intended, and the patentee also relied on these changes to the claim language to <u>overcome</u> a

22  double patenting rejection, asserting that the claim scope was no longer the same as to scope of

23

24

---

25  [4] While Rampion asserts that BN3TH's construction of "front portion" ignores the specific claim language requiring the front portion to be attached to the crotch panel at the first seam and the waistband at the waistband seam, D.CC.Br. at 3-4, that concept is already expressly required in the claim language and is not necessary for the trier of fact to understand what the "front portion" means in the context of the claim.

1    the claims that became the '030 patent.  *See* P.CC.Br. at 14-15 (citing cases and providing image

2    of blackline claim language revision); JCC Ex. 5 at 45-51.[5]

3            Undaunted by the prosecution history, Rampion construes "top location" exactly the

4    same as "waistband seam" and "bottom location" exactly the same as "first seam," just as if the

5    patentee had never amended the claim language to distinguish the '496 patent from the earlier

6    '030 patent.  Seeking to justify this re-writing of the claims, Rampion first relies on features of

7    exemplary embodiments, arguing that all embodiments shown in the Figures of the Specification

8    put the top edge of the stretch panel at the waistband seam and the bottom edge of the stretch

9    panel at the first seam.  *See* D.CC.Br. at 6-7, 10 (attempting to import features of exemplary

10   embodiments to re-write the claim language as if the claims of the '496 patent had never been

11   amended to differ from the '030 patent).  But this argument is legal error.  It is improper to re-

12   write the claims by importing features of mere exemplary embodiments ***even if the feature at***

     ***issue is present in every single embodiment disclosed in the Specification.***  *See Intellicheck*

13   *Mobilisa, Inc. v. Wizz Sys., LLC,* 173 F. Supp. 3d 1085, 1092 (W.D. Wash. 2016) ("[T]he court

14   must not read particular embodiments and examples . . . into the claims unless the specification

15   requires it."); *Motorola Mobility,* 2012 WL 13065775, at *16 (rejecting an attempt to exclude

16   part of a claim because it was not shown in the specification figures); *Nat'l Prods., Inc. v. Arkon*

17   *Res., Inc.*, No. C15-1984JLR et al., 2017 WL 4403328, at *4 (W.D. Wash. Oct. 2, 2017)

18   (rejecting attempt to import limitations from specification into claim language even where all

19   embodiments shared those features); P.CC.Br. at 5, 15 (citing cases).[6]

20           Rampion's reliance on extrinsic evidence, particularly dictionary definitions, to narrow the

21   _____

22   [5] The fact that dependent Claim 5 of the '496 patent is directed to the more specific situation where the top location
     is the same as the waistband seam (*see* D.CC.Br. at 6) only reinforces that the broader independent claim language is
     intended to include embodiments both where the top location is at and is not at the waistband seam.

23   [6] Rampion cites *Clare v. Chrysler Group LLC*, 819 F.3d 1323, 1330-31 (Fed. Cir. 2016), for the proposition that
     "[t]hough a difference in words can indicate a different scope between claims, that difference cannot expand a claim

24   term beyond the scope supported by the specification." D.CC.Br. at 6. *Clare* did not reach that holding, however. In
     fact, *Clare* does not discuss expanding a claim term at all in the relevant citation: that passage discusses the

25   difference between "an external appearance of a conventional pickup truck" versus "*substantially* the external
     appearance of a pickup," focusing on whether the first claim required an instantiation identical to an ordinary

26   pickup, and concluding that it did not because the relevant specification showed that external modifications were
     plainly visible, if discreet. *Clare,* 819 F.3d at 1330 (emphasis in original).

1   plain meaning of "top location" and "bottom location" to mean the waistband seam and first seam,

2   respectively, is also misplaced.  First, the dictionary definitions Rampion cites are in several cases

3   significantly broader than Rampion suggests, and are fully consistent with the top and bottom

4   location referring to the place on the garment's body where the top and bottom edges of the stretch

5   panel are attached (and not to any specific "seam," which has a different meaning than "location").

6   *See* D.CC.Br. at 7 (citing JCC Exs. 23 (definition of "top" consistent with top edge of stretch panel);

7   24 (similar); 25 (similar); 26 (definition of "location" to mean a place or position (*i.e.*, the area or

8   position where the top/bottom edge of the stretch panel is attached), not a "seam"); 28 (similar)); *see*

9   *also* JCC Ex. 27 (broad definition of "location" consistent with BN3TH's construction).

10      The "top location" and "bottom location" correspond to the top and bottom edges of the

11   *stretch panel,* not necessarily of the front portion.  In any event, extrinsic evidence, particularly

12   general-purpose dictionary definitions, cannot properly be used to ***contradict the intrinsic***

13   ***evidence***—here the clear amendment and arguments from the prosecution history demonstrate that

14   "top location" and "bottom location" are intended to be read more broadly than just "waistband

15   seam" and "first seam."  *See Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc.*, No. C16-0341JLR,

16   2017 WL 6550700, at *1-2 (W.D. Wash. Dec. 21, 2017) ("Intrinsic evidence . . . is the primary

17   source from which to derive a claim's meaning. . . .  Extrinsic evidence is usually 'less reliable

18   than the patent and its prosecution history' as a source for claim interpretation." (citation omitted)

19   (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005))); *Motorola Mobility*, 2012

20   WL 13065775, at *17 (agreeing with a party's proposed language because "it aligns with the

21   specification; [opposing party's] language, by contrast, is derived from extrinsic evidence").

22      Finally, Rampion argues, in effect, that the U.S. Patent and Trademark Office erred in

23   allowing the amendment that changed the scope of the '496 patent claims to be broader than the

24   '030 patent as to the "top location" and "bottom location."  D.CC.Br. at 8-9, 11.  In its invalidity

25   contentions, Rampion alleged that all claims of the '496 patent are invalid pursuant to 35 U.S.C.

26   § 112 (first paragraph) due to a purported lack of written description of the invention.  ECF No.

27   41-1 at 21 of 560.  Critically, that is a defense that Rampion bears the burden to prove by clear

1   and convincing evidence.  The inquiry turns on how a POSA would understand the disclosure in

2   the Specification of the '496 patent.  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351

3   (Fed. Cir. 2010) (en banc).  In this context, a POSA may be able to understand the disclosure of

4   one or more specific examples (species) of a broader claimed category (genus) to provide

5   adequate written description support for the entire genus.  *See, e.g., Hologic, Inc. v. Smith &*

6   *Nephew, Inc.*, 884 F.3d 1357, 1361-62 (Fed. Cir. 2018) (broader patent claim term "light guide"

7   was adequately supported based on written description of a "fibre optics bundle" which was one

8   specific example of a type of "light guide"); *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d

9   1340, 1360-61 (Fed. Cir. 2010) (broader claim term "single action . . . user input device" was

10  supported by written description discussion of a single mouse click, which is one example of the

11  broader class of "single action user . . . input device[s]" and a POSA would have been familiar

12  with other types of single action user input devices).

13         Rampion offers no evidence for how a POSA would understand the written description of

14  the '496 patent and certainly has not met its burden to prove invalidity by clear and convincing

15  evidence.  Rampion's invalidity arguments cast as claim construction arguments are, at most,

16  premature pending completion of fact and expert discovery and full briefing, for the same

17  reasons discussed below with respect to Rampion's indefiniteness arguments.  *See infra* Section

18  I.F.  When and if Rampion offers evidence to meet its burden, BN3TH will respond and rebut

19  any such evidence.

**C.    "A Dart Seam Stitched Along a Bottom Portion of the Pouch" Requires a "Dart" Seam, Not Any Seam, and Does Not Prohibit a Dart Seam Elsewhere in the Pouch.**

| **BN3TH:** A shaping seam where material has been folded or removed to provide three-dimensional shaping or space, where the seam is stitched along a bottom portion of the pouch. | **Rampion**: An <u>additional seam</u> present along the bottom portion of the front portion **but not along the top portion of the front portion**. |

23         As discussed in BN3TH's opening brief and as highlighted with underlining above,

24  Rampion's construction reads the critical word "dart" out of the term "dart seam." Rampion's

25  construction would improperly broadening the claim language to cover ***any seam*** added to the

26  bottom portion of the pouch, without requiring the seam to add three-dimensional shape and volume

1   to the pouch, a defining characteristic of a "dart seam," as reflected in dictionaries, industry

2   dictionaries and treatises, and the Specification.  P.CC.Br. at 22-23; JCC Exs. 48-49 (technical

3   treatise and glossary discussing "dart" seams); JCC Exs. 58-61 (Rampion's cited dictionary

4   definitions requiring "dart" seam to provide three-dimensional shaping, such as via removal or

5   folding-over of wedge-shaped fabric); Spec. at 2:37-46 (dart seam (19) "provid[es] extra fabric in

6   front portion 18" and thus "adds volume to pouch 20"), 6:35-38 (describing that "the shaping of

7   front portion 18 (e.g. by front seam ['dart seam'] 19) . . . makes fro[nt] portion 18 non-flat").

8           In its opening brief, Rampion offers no explanation for how its construction reading out

9   the "dart" in "dart seam" could comport with the plain meaning of the claim language.  Instead,

10  Rampion resorts to the straw man argument that the dart seam must be present in the bottom

11  portion of the pouch.  D.CC.Br. at 20-21.  BN3TH agrees that there must be a dart seam present

12  in the "bottom portion of the pouch," and includes that requirement in its construction.  That

13  concept is featured, in nearly identical language, in both parties' constructions: "where the seam

14  is stitched along a bottom portion of the pouch" and "present along the bottom portion of the

15  front portion."  The parties' actual dispute as to the location of the dart seam pertains to the

16  additional (and legally improper) language Rampion inserts into its construction: "but not along

17  the top portion of the front portion."  The claim language, which uses the open-ended term of art

18  "comprising" and requires that a dart seam be present and "stitched along a bottom portion of the

19  pouch," does not foreclose a garment that has this required feature, ***and also has*** dart seam

20  stitching present elsewhere, including in the top portion of the pouch.  Rampion's sole argument

21  in support of its "but not" language is that all exemplary embodiments depicted in the

22  Specification not only have a dart seam stitched along the bottom portion of the pouch (as the

23  claim requires) but also happen to have a dart seam only at that location.  D.CC.Br. at 20-21.

24  This argument is legal error.  A patent claim drafted with the transitional term "comprising" is

25  open ended and includes features in addition to those required by the claim language.  *See*

26  P.CC.Br. at 23-24 (citing authority); *see also, e.g., SanDisk Corp. v. Memorex Prods., Inc.*, 415

27  F.3d 1278, 1284 (Fed. Cir. 2005) ("Neither includes, nor comprising, forecloses additional

1    elements that need not satisfy the stated claim limitations.").  Rampion cites no authority for

2    limiting a "comprising" patent claim through claim construction to *exclude* additional, un-

3    claimed structures.  D.CC.Br. at 20-21.[7]

4    **D.    "Gathered from Side-to-Side and Top-to-Bottom by the Stretch Panel" Means Drawn**
     **Up to Form a Pouch and Cannot Mean "Puckered," as That Would Read Out All**
5    **Preferred Embodiments.**

| | |
|---|---|
| **BN3TH:** Plain and ordinary meaning; *in the alternative*: the front portion of the garment's body is drawn up both horizontally and vertically through attachment to the stretch panel, creating a concave space between the stretch panel and the front portion of the garment's body capable of receiving the wearer's genitals when the garment is worn. | **Rampion**: Puckered by the stretch panel along each of the side, waistband, and first seams. |

10       The claim language of Claim 1 of each Asserted Patent describes that the stretch panel,

11   due to its elastic four-way stretch properties, gathers (*i.e.*, pulls together, draws up) the parts of

12   the front portion attached to the top, bottom, and side edges of the stretch panel.  By pulling

13   together these edges, the stretch panel lifts the otherwise relatively flat front portion into a more

14   three-dimensional pouch shape, and creates a three-dimensional space between the (now curved)

15   front portion and the stretch panel.  The Specification is consistent with this understanding of

16   how the stretch panel gathers the attached parts of the front portion to form a pouch.  *See*

17   P.CC.Br. at 11-12 & n.5.  The vertical aspect (top-to-bottom) of this drawing up of the front

18   portion by the stretch panel is illustrated in Fig. 7 of both Asserted Patents.  *See* P.CC. Br. at 2-3

19   (annotated version of Fig. 7).  BN3TH's proposed construction above is entirely consistent with

20   this plain and ordinary meaning of the claim language and with the supporting discussion in the

21   Specification.  Indeed, Rampion's only criticism of BN3TH's proposed construction is that it

22   uses too many words.  D.CC.Br. at 14-15 & n.5.  Of course, BN3TH's primary position is that

23   the *plain and ordinary meaning* to a jury is sufficient and no construction is necessary.  If the

---

24   [7] The sole case Rampion cites in its discussion of this claim term is *Howmedica Osteonics Corp. v. Zimmer*, 822 F.3d
     1312, 1321 (Fed. Cir. 2016).  In *Howmedica*, the parties disputed where elements required in the claims (a "recess" and

25   a "taper") must be found in a hip replacement implant device.  The Federal Circuit held that the claim language should
     be construed to require that these elements be *present* near the midway point, to comport with the teachings of the

26   specification about how the invention works.  *Id.*  But nothing about the Federal Circuit's holding or reasoning in
     *Howmedica* discusses or suggests construing a comprising patent claim to foreclose additional, *unclaimed features*.

1    Court elects to construe this term, however, BN3TH's alternative construction properly seeks to

2    explain the meaning of the phrase to the jury in appropriate context and not merely to cut/paste

3    the construction in place of the claim language grammatically in a minimum number of words.

4         In contrast, Rampion insists (D.CC.Br. at 14-16) that the claim language be entirely re-

5    defined to mean *puckering* and to require puckering on each of four specific seams—two of

6    which are not seams where the stretch panel is required to be attached in the '496 patent.  *See*

7    *supra* Section I.B.  Rampion's proposed construction lacks any support in the claim language, or

8    elsewhere in the intrinsic evidence.  Neither the claim language nor the rest of the intrinsic

9    evidence teaches, discusses, or shows puckering of the front portion along any of the four seams

10   Rampion identifies.  Indeed, the idea of "puckering" is introduced solely by Rampion's

11   arguments.  Rampion points to a description of an exemplary embodiment in the Specification

12   (in which the stretch panel *may be* stretched before attaching its edges to the front portion), but

13   (1) the claims do not require use of that exemplary embodiment and (2) nothing in the cited

14   portion (or any other portion) of the Specification mentions puckering at all, or shows puckering

15   along any stretch panel seam.  *See* D.CC.Br. at 15-16 (citing Spec. at 5:43-6:18, 6:31-35 & Fig.

16   16).  The concept of puckering appears only in Rampion's brief—not in the Asserted Patents.[8]

17        Significantly, Rampion's proposed construction would exclude from the scope of all

18   claims of the Asserted Patents the preferred embodiments discussed and depicted in the

19   Specification.  All figures in the Specification show the four seams as *smooth*, with no puckering

20   along any of them.  *See* Spec. Figs. 1-16; P.CC.Br. at 11-12.  If Rampion's proposed

21   construction were adopted, these embodiments, with their smooth (un-puckered) seams, would

22   fall outside the scope of the claims, proving that Rampion's proposed construction cannot be

23   correct as a matter of law.  *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed.

24   Cir. 2014) (reversing district court's construction "because it reads out preferred embodiments").

---

[8] Rampion also points to language in Claim 1 of each Asserted Patent providing that the length (vertically and
horizontally) measured along the front portion of the pouch is less than the length measured along the stretch panel.
D.CC.Br. at 15.  But this claim language reflects that the front portion is pulled into a three-dimensional, curved
shape while the stretch panel remains straight and taut (like the letter "D"), and that the distance along the curved
portion is longer than along the straight portion.

1  The only thing Rampion can offer to support its "puckering" construction are cherry-picked

2  portions of extrinsic dictionary definitions (D.CC.Br. at 16 (citing JCC Exs. 58, 59, 61)), which

3  cannot be used to contradict the intrinsic evidence and certainly are insufficient to support a

4  construction that excludes all preferred embodiments from the Asserted Patents.  *See*

5  *Intellicheck*, 2017 WL 6550700, at *1; *Timeline, Inc. v. Proclarity Corp.*, No. C05–1013JLR,

6  2006 WL 6143242 (W.D. Wash. June 29, 2006); *Motorola Mobility*, 2012 WL 13065775, at *17.

7  **E.     "Substantially Continuously Along Either Side of the Front Portion" Does Not Re-Write the Definition of Top Location and Bottom Location.**

| **BN3TH:** Plain and ordinary meaning; *in the alternative:* each side seam attaches one side edge of the stretch panel to the inside of the front portion of the garment's body. | **Rampion**: largely, but not necessarily wholly, uninterrupted **along the entire length of each side of the front portion**. |
| --- | --- |

11  Rampion tries to shoehorn  into its proposed construction of "substantially continuously

12  along either side of the front portion" the language "along the entire length of each side of the

13  front portion" (emphasized above).  *See* D.CC.Br. at 11-14.  This language effectively repeats

14  Rampion's improper attempt to construe "top location" and "bottom location" as being identical

15  in meaning to "waistband seam" and "first seam."  *See supra* Section I.B.  As discussed above,

16  the claims of the '496 patent do not require the stretch panel to span the entire height of the front

17  portion because the top and bottom edges of the stretch panel are claimed as attaching at the top

18  location and bottom location, which need not be exactly at the waistband seam and first seam,

19  respectively.  In arguing for this revision of the meaning of "top location" and "bottom location,"

20  Rampion ignores the '496 patent entirely, citing only the claims, specification, and prosecution

21  history of the *'030 patent*, other than one brief (and incomplete) notation that the claim language

22  of the '496 patent is different.  *See* D.CC.Br. at 11-13.  Rampion's effort to re-write the claims of

23  the '496 patent in the context of this term is as problematic as its effort to do so by re-defining top

24  location and bottom location, and should be rejected for the same reasons.  *See supra* Section I.B.

25  The concept Rampion is attempting to address with this inserted language in the claim

26  construction is already addressed elsewhere in the claim language of Claim 1 of each Asserted

27  Patent, and Rampion's proposed construction is *different from* the actual requirements of the

1    claim language (and therefore inaccurate).  Claim 1 of the '030 patent requires that the seams at

2    the side *of the stretch panel* run down the entire length of the front portion ("the stretch panel

3    comprising . . . side edges attached to the body at side seams extending substantially

4    continuously along either side of the front portion <u>from the first seam to the waistband seam</u>"

5    (emphasis added)).  In Claim 1 of the '496 patent, however, ***the language underlined above was***

6    ***removed*** at the same time the attachment point for the top and bottom edges of the stretch panel

7    was changed to be the top location and bottom location.  JCC Ex. 5 at 46.  Rampion's proposed

8    construction cannot apply equally to patent claims that use different (and inconsistent) language

9    and thus have different claim scopes on this issue.  Indeed, Rampion's proposed construction is

10   inconsistent with the actual amendments to the '496 patent claims during prosecution (JCC Ex. 5

11   at 46) shown below, which show that the top and bottom edges of the stretch panel need not

12   attach exactly at the waistband seam and first seam (and thus that the side edges of the stretch

13   panel need not run all the way from the first seam to the waistband seam either).   Any such

     construction was deleted as shown in blacklining.

14

15              a stretch panel attached to the body inside the front portion, the stretch panel
        comprising a sheet of elastically resilient four-way stretch material having a top edge attached
16      to the body at ~~the waistband seam~~ a top location, a bottom edge attached to ~~the first seam~~ body at
        a bottom location, side edges attached to the body at side seams extending substantially
17      continuously along ~~wither~~ either side of the front portion ~~from the first seam to the waistband~~
        ~~seam~~ and an opening for receiving a wearer's genitals, the opening having a rounded bottom
18      edge and opposing side edges that are spaced apart from one another on either side of the
        opening;
19              the stretch panel being resiliently elastic both in a direction between the top edge
20      and the bottom edge <u>and</u> in a direction between the side edges, the stretch panel having a length
        when unstretched smaller than a length measured along the front portion between the ~~first seam~~
21      top and ~~the waistband seam~~ bottom locations and a width when unstretched smaller than a width
        measured along the front portion between the side seams such that the front portion is gathered
22      from side-to-side and top-to-bottom by the stretch panel and defines a three-dimensional pouch
23      between the stretch panel and the front portion for receiving the wearer's genitals and holding the
        wearer's genitals while the garment is being worn.
24

25         BN3TH's primary position is that this term need not be construed at all and that a plain

26   and ordinary meaning construction is appropriate.  The jury will readily understand what

1    "substantially continuously along either side of the front portion" means.  By rejecting

2    Rampion's effort to re-write the '496 patent claims by inserting "along the entire length of each

3    side of the front portion," the Court would resolve the dispute between the parties as to the scope

4    of this claim term.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)

5    ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term

6    . . . .").  As discussed in BN3TH's opening brief, the first half of Rampion's proposed

7    construction, taken alone, appears to differ little from BN3TH's approach to this term, and is not

8    necessarily objectionable.  While Rampion asserts that the claim phrase "substantially

9    continuously along either side of the front portion," added during prosecution of the '030 patent,

10   was "necessary to overcome prior art references with non-continuous side seams," D.CC.Br. at

11   12, that assertion is both wrong and inapposite.

12          In fact, the October 25, 2013 Office Action Response that Rampion references from the

13   '030  patent prosecution history first made a number of other arguments explaining how the Reis

14   prior art reference at issue was far different than the claimed invention on other grounds,

15   including because (1) Reis lacked a stretch panel at all but only had a non-vertically stretching

16   panel inside of its pouch; and (2) the front portion of Reis was not "gathered" into a three-

17   dimensional pouch by attachment to the (non-existent) stretch panel, but was formed into a

18   pouch as a result of stitching attaching the two layers of the front portion together to force them

19   into a pouch shape.  *See* JCC Ex. 3 at 63-64.  The patentee's argument as to "substantially

20   continuous" thus was <u>not</u> "necessary" to overcome prior art, as Rampion asserts.  In any event,

21   the argument related to the specific way the fly opening was implemented in Reis—not to all fly

22   openings, and not to the very different fly opening structure used in Rampion's accused products.

23   The argument as to Reis' fly opening was not a clear disavowal of any part of the plain and

24   ordinary scope of the claim language, and thus is not a basis to depart from the plain and

25   ordinary meaning.  *REC Software USA, Inc. v. Bamboo Sols. Corp.*, No. C11–0554JLR, 2012

26   WL 1533965, at *11-12 (W.D. Wash. Apr. 30, 2012) (rejecting allegation of prosecution history

     disclaimer where prosecution history statement at issue was ambiguous).

PLAINTIFFS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

(102137746.3 0068561-00001) -  15

1    **F.    Asymmetrical Stretch Characteristics**

| | |
|---|---|
| 2  **BN3TH:** The amount of stretch of the fabric produced when force is applied in one direction 3  differs from the amount of stretch produced when the same amount of force is applied to the 4  fabric in a different direction. | **Rampion**: Indefinite. |

5         The parties do not dispute what the words "asymmetrical stretch characteristics"

6    themselves mean.  The phrase is expressly defined in the Specification: "the coefficient of

7    elasticity of the material has a first value in a first direction in the plane of the material and a

8    second value different from the first value in a second direction at right angles to the first

9    direction in the plane of the material."  Spec. at 5:8-16.  BN3TH's position is that this

10   Specification definition, simplified and explained in terms a jury can readily understand, is the

11   appropriate claim construction: "The amount of stretch of the fabric produced when force is

12   applied in one direction differs from the amount of stretch produced when the same amount of

13   force is applied to the fabric in a different direction."  Rampion does not argue that BN3TH's

14   proposed construction is in any way inaccurate or improper.  *See* D.CC.Br. at 16-18 (failing to

15   discuss BN3TH's proposed construction at all).  Accordingly, BN3TH's straightforward

16   proposed construction should be adopted at the claim construction stage.

17         Without challenging the meaning of the specific words at issue ("asymmetrical stretch

18   characteristics"), Rampion asserts that a POSA would not know what <u>protocol to use to test</u>

19   whether an accused product's stretch panel meets this construction (that is, whether the

20   measurement should be conducted on the stretch panel while attached to the rest of the garment, or

21   detached from the garment), and on this basis asserts that Claim 2 of each Asserted Patent is

22   invalid as indefinite.  D.CC.Br. at 16-18.  Indefiniteness is a separate question from claim

23   construction, and as an invalidity defense (and counterclaim) must be proven by clear and

24   convincing evidence.  *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

25   Currently, Rampion has not come forward with any ***evidence*** at all as to how a POSA would or

26   would not understand or apply Claim 2 of either Asserted Patent.  Instead, Rampion offers attorney

27   argument ***speculating*** that a POSA might be uncertain about whether to measure the stretch

1    panel's stretch characteristics when attached to or detached from the garment, and that differences

2    in this test methodology might potentially change the test outcome.  D.CC.Br. at 16-18.  There is

3    no evidence on which the Court could base a finding of indefiniteness of any patent claim, much

4    less by clear and convincing evidence.  *See Intellicheck*, 2017 WL 6550700, at *5 (rejecting

5    attorney argument as to indefiniteness unsupported by *evidence* from a POSA); *see also* P.CC.Br.

6    at 20 & n.7 (citing cases holding that indefiniteness should await full fact and expert discovery).

7            Rampion cites *Cox Communications, Inc. v. Sprint Communication Co.*, 838 F.3d 1224,

8    1232 (Fed. Cir. 2016), as if *Cox* supported the proposition that "Courts normally decide

9    indefiniteness as part of the claim construction process."  D.CC.Br. at 17.  *Cox* supports the

10   opposite conclusion.  The Federal Circuit in *Cox* reversed the district court's finding of

11   indefiniteness, which had been made at *summary judgment*, not at claim construction.  The court

12   explained that claims as a whole (not mere claim terms or elements) must be analyzed for

13   indefiniteness, which requires proof that "a person of ordinary skill in the art cannot discern the

14   scope of a claim with reasonable certainty"—a question extending beyond the construction of

15   any individual claim term.  *Id.* at 1232.  As discussed above, Rampion has presented no evidence

16   as to how a POSA would or would not understand Claim 2 of either Asserted Patent.  There is no

17   dispute as to the meaning the Specification attributes to the phrase "asymmetrical stretch

18   characteristics."  Accordingly, at the claim construction stage, BN3TH's straightforward

19   construction of this phrase based on the Specification definition should be adopted.

**G.    "Stretch Panel" and "Crotch Panel" Refer to Separate *Panels* of Material.**

20          At the core of the parties' dispute over the meaning of claim terms "stretch panel" and

21   "crotch panel" is whether these terms, which both share the noun "panel," refer to material

22   separate from surrounding components of the undergarments, <u>or</u> can refer to a mere region of a

23   larger piece of fabric.  In asserting that neither term requires separate material, Rampion

24   improperly reads out the word "panel" from the claim language.  In the garment industry, the

25   term "panel" is consistently used to refer to separate material distinct from (but attached, via a

26   seam, to) surrounding components of a garment.  *See* JCC Ex. 50 at 5, 97-98, 147, 152, 157, 172,

173 (uses of "panel" to mean separate fabric joined to adjacent elements of a garment via seams);

JCC Ex. 47 (U.S. Patent No. 5,081,716 at Figs. 1-10, 2:8-18, 3:6-21) (use of "crotch panel" to

refer to a separate fabric element interposed in the crotch region between the front and back

panels of the undergarment).  Thus, the word "panel" has meaning to a POSA, and this

background meaning of "panel" as separate material is critical to how a POSA would understand

the claim phrases ("stretch panel" and "crotch panel") in the context of the Asserted Patents, the

starting point for the claim construction analysis.  *See O2 Micro Int'l Ltd. v. Beyond Innovation*

*Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (ordinary meaning is "the meaning a term

would have to a [POSA] after reviewing the intrinsic record at the time of the invention" (citing

*Phillips*, 415 F.3d at 1313)).  The Specification also confirms that both the "stretch panel" and

the "crotch panel" are intended to be separate *panels* of material, not mere regions of other

components of the garment.  *See* Spec. at Figs. 1-16, Abstract, 1:40-43, 2:15-16, 2:51-55, 3:34-

38, 4:58-67; *see also* P.CC.Br. at 9-10, 17-18 (citing and discussing Specification support for

"stretch panel" and "crotch panel" constructions).

### 1. "Stretch Panel"

| | |
|---|---|
| **BN3TH:** Four-way stretch material separate from and joined to the inside of the garment's body that includes an opening for the wearer's genitals. | **Rampion**: Plain and ordinary meaning. |

Even though Rampion continues to assert that no construction of the term "stretch panel"

is needed, D.CC.Br. at 21-22, there is a live dispute between the parties as to whether the "stretch

panel" must be fabric (specifically, four-way stretch material) separate from and joined to the

inside of the garment's body, as BN3TH's proposed construction requires.  Rampion offers no

evidence or argument that these requirements are inaccurate, but only asserts that such a

construction is unnecessary.  *Id.*  Rampion, however, has asserted that structures in alleged prior

art undergarments are stretch panels even though those structures either (1) are located outside

(rather than *inside*) the body of the undergarment or (2) are a part of the actual body of the

undergarment, not stretch material *separate* from the body of the undergarment.  *E.g.*, ECF No.

1    34-3, Table B-1 at 24-34 of 100.  As such, the parties dispute whether the stretch panel must be

2    material separate from and joined to the inside of the garment's body.  Such separateness is

3    required by the context of the claim language, the meaning of "panel" to a POSA, and the

4    teachings of the Specification (detailed in BN3TH's opening brief, P.CC.Br. at 9-10).

5        Rampion's only argument against BN3TH's proposed construction is its assertion that

6    portions of the construction are redundant because they repeat requirements found elsewhere in

7    the claims, and that BN3TH has not restated all claim elements of Claim 1 of either Asserted

8    Patent relating to the stretch panel in its construction.  D.CC.Br. at 21-22.  BN3TH, however, has

9    not tried to repeat all elements of any claim in its construction, but only to articulate a clear

10   construction consistent with the claim language that resolves the dispute over the separateness of

11   the stretch panel from the body of the garment.  In doing so, it became clear that a construction

12   that merely said the "stretch panel" must be separate material attached inside the garment's body

13   might be misleading to the trier of fact, as it might appear to conflict with the requirement

14   elsewhere in the claims that (1) the stretch panel not be made from *fabric material of any kind,*

15   but specifically comprised of four-way stretch material and (2) the stretch panel must have an

16   aperture for receiving the wearer's genitals.  To resolve the parties' live dispute while avoiding

17   any confusion or inconsistency, BN3TH included these elements in its construction as consistent

18   with the express requirements elsewhere in Claim 1 of each Asserted Patent.  *See Sulzer*, 358

19   F.3d at 1366 ("[T]he district court must instruct the jury on the meanings to be attributed to all

20   disputed terms used in the claims in suit so that the jury will be able to intelligently determine the

21   questions presented." (internal quotation marks and citation omitted)).

22       **2.    "Crotch Panel"**

| **BN3TH:** Fabric separate from and joined to both the front portion and the back side of the garment's body, in the region that is adjacent to the wearer's crotch when the garment is worn. | **Rampion**: Plain and ordinary meaning. |
|---|---|

25       With respect to "crotch panel," Rampion again argues that no construction is necessary

26   (arguing for plain and ordinary meaning), but ignores the same live dispute over the meaning of

1  "panel."  Like "stretch panel," Rampion's would implicitly vitiate the word "panel" by taking the

2  position that the crotch panel need not be a separate piece of fabric from surrounding parts of the

3  undergarment (particularly the rear of the garment).  *See* D.CC.Br. at 22-24.  Rampion argues

4  that whatever the bottom edge of the front panel is attached to should be defined as the "crotch

5  panel," contrary to the plain and ordinary meaning of "crotch panel" and all descriptions of the

6  "crotch panel" in the Specification.  D.CC.Br. at 23 (asserting that the crotch panel need not be

7  separate from and could be a part of the back side of the garment's body).  This dispute is

8  important, because certain prior art references that Rampion has relied upon in its invalidity

9  contentions use a structure where the rear part of the underwear connects directly to the front

10  portion in the crotch area, and thus lack any crotch panel.  Rampion's proposed approach to

11  "crotch panel" would read out "panel" (and indeed the entire term "crotch panel") from Claim 1

12  of each Asserted Patent and effectively substitute it with "any other part of the garment's body."

13  Rampion's approach assumes that "crotch panel" is a term without any independent

14  meaning but is used in the Asserted Patents only to name whatever structure the bottom edge of

15  the front portion happens to connect to (like the term "first seam").  That assumption is wrong,

16  and inconsistent with the teaching of the Specification and prosecution history.  Spec. at Figs. 1-

17  15, 1:40-43, 2:51-55, 4:58-67; JCC Ex. 3 at 51-52 (April 25, 2013 Office Action) (analyzing the

18  presence of absence of a "crotch panel" in prior art references based on the industry meaning in

19  existence at the time of the invention that "crotch panel" refers to a separate panel of fabric at the

20  crotch region between the wearer's legs, *added* to the body of a garment to provide greater

21  comfort for the wearer).

22  Rampion also ignores the fact that "crotch panel" was a term with a specific meaning

23  known and used in the industry prior to the invention of the Asserted Patents—*i.e.,* a separate

24  panel of fabric disposed in the crotch area of an undergarment attached between the front and

25  back of the undergarment.  *See* JCC Ex. 47 (U.S. Patent No. 5,081,716 at Figs. 1-10, 2:8-18, 3:6-

26  21).  While Rampion asserts that BN3TH's proposed construction errs by importing features

27  from exemplary embodiment into the claims, Rampion's use of this argument is misplaced.

1   BN3TH's construction of "crotch panel" (unlike Rampion's proposed constructions of other

2   terms, such as "front portion" discussed above) does not narrow the plain meaning of broader

3   claim language using Specification examples.  Rather, the plain meaning of the claim language

4   itself, "crotch panel," refers to separate fabric located between the wearer's legs and near the

5   wearer's crotch and disposed between the front and rear of the garment's body.  That plain

6   meaning is consistent with and confirmed by the Specification and prosecution history, as

7   discussed above.  It is appropriate to look to the Specification to confirm the plain and ordinary

8   meaning of a claim term to a POSA.  *Phillips*, 415 F.3d at 1316 ("[T]he specification necessarily

9   informs the proper construction of the claims.").

10  **H.   The Specification Teaches and the Preferred Embodiments Require that "Rectangular" Is Not Limited to Perfect Geometric Rectangles.**

| | |
|---|---|
| **BN3TH:** An exterior outline with four corners and with one [opposing] pair of edges significantly longer than the [other] opposing[9] pair of edges. | **Rampion**: The shape of a rectangle. |

14      Rampion insists that "rectangular" can only describe shapes that are *exactly a geometric*

15  *rectangle*.  D.CC.Br. at 18-19.  If that was what the patentee intended, the claim language easily

16  could have said "wherein the stretch panel is *a rectangle*," rather than the broader language

17  "wherein the stretch panel is *rectangular*" in the claims.  *See* '030 patent Claim 3; '496 patent

18  Claim 3.  As a matter of law, "rectangular" must be construed to include the preferred

19  embodiment described in the Specification.  *Epos Techs.*, 766 F.3d at 1347 (reversing

20  construction "because it reads out preferred embodiments"); P.CC.Br. at 20-21.[10]  The preferred

21  embodiment "stretch panel" described in the Specification as "generally rectangular" is plainly

22  not a geometric rectangle.  Spec. at 4:25-38, 4:44-49 (describing stretch panel of embodiment

---

[9] Rampion raises a valid point that the longer pair of edges are opposed to each other and adjacent to the shorter pair of edges, and vice versa.  The placement of "opposing" was an error in BN3TH's construction, and is corrected here to convey the intended meaning.

[10] The plain and ordinary meaning of "rectangular" to a POSA also includes an understanding that "rectangular" is broad enough to encompass shapes that are not perfect rectangles.  *See* JCC Ex. 45 (the industry treatise and textbook *Patternmaking for Fashion Design*) (including examples of "rectangular" used to describe shapes that are clearly not literal geometric rectangles, such as the body shape of some persons, the profile of certain skirts, and the shape of certain jeans pockets).

1    depicted in Figs. 1-8 as "rectangular"); *see also* P.CC.Br. at 20-21.  Rampion's proposed

2    construction is legal error because it would exclude the preferred  embodiment described and

3    shown in the Specification.

4           Rampion contends that the reference to an embodiment of the invention with a "generally

5    rectangular" stretch panel in the Specification is inapposite to the meaning of a "rectangular"

6    stretch panel in the claims, because the Specification adds the word "generally."  A patent

7    specification, however, need not use precisely the same *words* as the claims in order to teach a

8    POSA concepts that explain the meaning of a claim term.  Use of qualifying words like generally

9    or substantially when describing the concept in the specification makes clear that the inventor

10   contemplated degrees of imprecision in applying the concept when practicing the invention.  For

11   example, in *Denneroll Holdings Pty Ltd. v. Chirodesign Group, LLC*, No. 4:15-CV-740, 2016

12   WL 705207, at *4 (S.D. Tex. Feb. 23, 2016), the patent claim required a side face oriented

13   "orthogonal" (*i.e.,* intersecting at a right angle) to a base.  The specification in that patent tied the

14   qualifying word "substantially" to the meaning of orthogonal, indicating that the angle must be

15   similar to but not necessarily exactly, 90 degrees, but was not found to reference a different, un-

16   claimed concept, as Rampion asserts here.  *Id.* ("Because the language of

17   the specification expressly ties the adverb 'substantially' to the term 'orthogonal,' it is clear that

18   the claim term 'orthogonal' 'envisions some amount of deviation from exactly [90

19   degrees].'" (brackets in original) (quoting *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,

20   Inc.*, 340 F.3d 1293, 1311 (Fed. Cir. 2003), and citing *Oakwood Energy Mgmt., Inc. v. Le*, No.

21   02–74730, 2003 WL 25784783, at *4 (E.D. Mich. Nov. 6, 2003))); *see also Medtronic Vascular

22   Inc. v. Advanced Cardiovascular Sys., Inc.*, No. C 06-1066 PJH, 2007 WL 4557794, at *16 (N.D.

23   Cal. Dec. 21, 2007) (meaning of claim phrase "flat apex" was broadened beyond perfectly flat

24   shape by discussion of "apex" described in specification as being "substantially flat").[11]  In any

---

[11] Rampion cites two inapposite cases with respect to this claim phrase in its opening brief.  In *General Electric Co.

25   v. International Trade Commission*, 685 F.3d 1034, 1041 (Fed. Cir. 2012), the Federal Circuit considered a patent
     for an electricity-generating wind turbine with an emergency disconnect feature that would disconnect the turbine in
     the event of an anomaly in the power grid, and wait for current to return to a pre-set value before re-connecting.

26   Although the patent's specification also taught that the invention could alternatively be configured to re-connect

1  event, as this Court has previously observed, claim construction turns on the sound practical u

2  nderstanding of the claims and intrinsic evidence as a whole and is not a "'gotcha' game in

3  which an imprecisely used word invariably dooms the inventor." *Koninklijke Philips Elecs. NV v.*

4  *Defibtech LLC*, No. C03–1322JLR, 2005 WL 3500783, at *4 (W.D. Wash. Dec. 21, 2005).

5       Here, the Specification explains that the stretch panel of the exemplary embodiments

6  depicted in Figs. 1-8 and 16, despite not being a precise geometric rectangle, is "generally

7  rectangular."  This teaches a POSA evaluating the plain and ordinary meaning of the claims, *in*

8  *light of the Specification*, that the term "rectangular" as used in the claims is intended to be broad

9  enough to capture shapes that are like rectangles, but are not perfect rectangles.  *See O2 Micro*,

10  521 F.3d at 1360 (ordinary meaning is "the meaning a term would have to a person of ordinary

11  skill in the art after reviewing the intrinsic record at the time of the invention" (citing *Phillips*,

12  415 F.3d at 1313)).

13       Unable to defend its own construction under the intrinsic evidence, Rampion invokes a

14  hypothetical shape it asserts would fall within a strained reading of BN3TH's construction and

15  relies on this hypothetical shape to argue that BN3TH's proposed construction must be too

16  broad.  D.CC.Br. at 20.  This argument does not provide a basis to adopt Rampion's legally

17  improper proposed construction, which would read out the preferred embodiment as discussed

18  above.  In any event, Rampion's hypothetical shape is not clearly less "rectangular" than the

19  exemplary preferred embodiment stretch panel identified as rectangular in the Specification, or

20  shapes identified as "rectangular" in industry treatises:

21

22

23

24  power after a fixed period of time, the claim language was specific to measuring the amount of electrical current, and thus could not be stretched to reach time-based reconnection.  *Id.*; *see also Lucent Techs., Inc. v. Gateway, Inc.*,

25  525 F.3d 1200, 1215 (Fed. Cir. 2008) (refusing to ignore express and unambiguous language in claim that could not be squared with one party's incorrect and incomplete reading of specification examples).  Here, in contrast, only one

26  example of a rectangular stretch panel is discussed in the Specification (the embodiment of Figs. 1-8 and 16), and Rampion's proposed construction is wrong as a matter of law because it would exclude that preferred embodiment.



| Rampion's<br>Hypothetical<br>(R.CC.Br. at 20) | Spec. Fig. 16<br>"generally rectangular"<br>stretch panel | JCC Ex. 45 at 3<br>"rectangular" body shape | JCC Ex. 45 at 4<br>"rectangular" skirt |

A POSA's understanding of the term "rectangular" may be different in architecture or geometry than in the garment industry.  In light of the Specification's text and figures, a POSA in the field of the Asserted Patents would understand "rectangular" to mean "an exterior outline with four corners and with one opposing pair of edges significantly longer than the other opposing pair of edges."

## II.    CONCLUSION

For the reasons discussed above, BN3TH's proposed constructions of the disputed claim terms should be adopted, and Rampion's proposed constructions rejected.

RESPECTFULLY SUBMITTED: June 7, 2019.

STOEL RIVES LLP
*/s/ Brian C. Park*
Brian C. Park, WSBA No. 25584
600 University Street, Suite 3600
Seattle, WA  98101-4109
Telephone: (206) 386-7542
Facsimile:  (206) 386-7500
Email:  brian.park@stoel.com

*/s/ Steven T. Lovett*
Steven T. Lovett (admitted *pro hac vice*)
steve.lovett@stoel.com
*/s/ Nathan C. Brunette*
Nathan C. Brunette (admitted *pro hac vice*)
nathan.brunette@stoel.com
760 S.W. Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:   (503) 220-2480
Attorneys for Plaintiffs

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that I served the foregoing **PLAINTIFFS' RESPONSIVE CLAIM**

3

**CONSTRUCTION BRIEF** on the following named person(s) on the date indicated below by

4

¨    mailing with postage prepaid

5

¨    hand delivery

6

¨    facsimile transmission

7

¨    overnight delivery

8

¨X  CM/ECF notification

9

Paul Meiklejohn
meiklejohn.paul@dorsey.com

10

Erin Kolter
kolter.erin@dorsey.com

11

Dorsey & Whitney LLP
701 Fifth Avenue, Suite 6100

12

Seattle, WA  98104

13

Attorneys for Defendants

DATED:   June 7, 2019.

14

15

16

/s/ Brian C. Park
Brian C. Park, WSBA No. 25584

17

Steven T. Lovett (admitted *pro hac vice*)
Nathan C. Brunette (admitted *pro hac vice*)

18

Attorneys for Plaintiffs

19

20

21

22

23

24

25

26

CERTIFICATE OF SERVICE - 1
(102137746.3 0068561-00001)

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone 206.624.0900*