UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| 0912139 B.C. LTD, et al.,<br><br>               Plaintiffs,<br><br>     v.<br><br>RAMPION USA INC., et al.,<br><br>               Defendants. | CASE NO. C18-1464JLR<br><br>CLAIM CONSTRUCTION ORDER |

## I. INTRODUCTION

This is a claim construction order in a patent infringement case involving two related patents: U.S. Patent No. 9,687,030 ("the '030 Patent") and U.S. Patent No. 10,034,496 ("the '496 Patent") (collectively, "the Patents"). Plaintiffs 0912139 B.C. Ltd. ("B.C. Ltd.") and Pakage Apparel Inc. (d/b/a BN3TH) ("Pakage") (collectively, "Plaintiffs") allege that Defendants Rampion USA Inc. and Rampion Enterprises Ltd. (collectively, "Defendants") have infringed the Patents. (Compl. (Dkt. # 1) ¶¶ 32-61.) The parties dispute the construction of 10 claim terms. (*See* Jt. Cl. Chart (Dkt. # 47-1) at

1-94.) The court has reviewed the parties' joint prehearing statement and claim

construction chart (Jt. Stmt. (Dkt. # 47); Jt. Cl. Chart), their claim construction briefs (Pl.

Br. (Dkt. # 49); Def. Br. (Dkt. # 48); Pl. Resp. (Dkt. # 51); Def. Resp. (Dkt. # 50)), the

materials filed in support of the claim construction briefs, the relevant portions of the

record, and the applicable law. The court also heard from counsel at a *Markman* hearing[1]

on July 12, 2019. (7/12/19 Min. Entry (Dkt. # 52); *see also* Tr. (Dkt. # 56).) Being fully

advised, the court construes the disputed terms as set forth below.

## II.    BACKGROUND

The Patents are directed to an undergarment for men that "include[s] [a] pouch to

receive the wearer's genitalia" ("the Invention"). (*See* Compl. ¶ 20, Ex. 4 ("'030 Patent")

at 2:29-30; *see also id.* ¶ 19, Ex. 3 ("'496 Patent") at 2:27-29.) The Invention comprises

"a body including a front portion and having leg openings for a wearer's legs," as well as

a "stretch panel attached to the body inside the front portion." (*See* '030 Patent at

8:17-18, 23-24; '496 Patent at 8:14-15, 20-21.) The Invention also claims a "crotch

panel" between the leg openings. ('030 Patent at 19-20; '496 Patent at 15-16.) The

stretch panel, which is "resiliently elastic," is smaller than the front portion. ('030 Patent

at 8:25-42; '496 Patent at 8:31-38.) Accordingly, the stretch panel works to "gather[]"

the front portion "from side-to-side and top-to-bottom," creating "a three-dimensional

pouch." ('030 Patent at 8:42-44; '496 Patent at 8:38-40.) The wearer of the

//

---

[1] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996).

1  undergarment inserts his genitals through an opening in the stretch panel, and the pouch

2  supports the genitals.  ('030 Patent at 8:31, 45-47; '496 Patent at 8:27-28, 40-44.)

3      Figures 1 and 6, which appear in both Patents, illustrate a preferred embodiment.

4  The drawings show the garment's waistband [12], body [14], front portion [18], stretch

5  panel [22], and the opening in the stretch panel [30].



FIG. 1



FIG. 6

22  ('030 Patents, Figs. 1, 6; '496 Patent, Figs. 1, 6.)

The '496 Patent is a continuation of the '030 Patent (*see* '496 Patent at 1:6-11), and the Patents share a substantially identical specification (*compare* '030 Patent, *with* '496 Patent). The primary difference between the Patents concerns the locations where the stretch panel attaches to the front portion of the garment's body. (*See* Pl. Br. at 3-4.) Claim 1 of the '030 Patent discloses a stretch panel with a top edge attached to the front portion at the "waistband seam" and a bottom edge attached to the front potion at the "first seam"—that is, the seam where the crotch panel meets the front portion. ('030 Patent at 8:15-17, 23-27.) In contrast, claim 1 of the '496 Patent discloses a stretch panel with a top edge attached to the front portion at a "top location," rather than the waistband seam, and a bottom edge attached to the front portion at a "bottom location," rather than the first seam. ('496 Patent at 8:20-24.)

The parties dispute the meaning of 10 claim terms:[2] (1) "front portion"; (2) "stretch panel"; (3) "crotch panel"; (4) "top location"; (5) "bottom location"; (6) "substantially continuously along either side of the front portion"; (7) "gathered from side-to-side and top-to-bottom by the stretch panel"; (8) "asymmetrical stretch characteristics"; (9) "rectangular"; and (10) "a dart seam stitched along a bottom portion of the pouch." (*See generally* Jt. Cl. Chart.)

//

//

---

[2] In their claim construction chart, the parties identified two additional disputed terms. (*See* Jt. Cl. Chart at 86-94; *see also* Jt. Stmt. at 5 n.4.) At the *Markman* hearing, however, the parties agreed with the court's inclination to refrain from construing the additional terms, pending construction of the remaining terms. (Tr. at 65:21-66:8.)

# III.    DISCUSSION

## A.    Law on Claim Construction

The court is solely responsible for construing patent claims. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). The court construes claims as a matter of law, although the court may make subsidiary factual findings regarding extrinsic evidence. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, --- U.S. ---, 135 S. Ct. 831, 836-38, 840-42 (2015). In practice, executing the *Markman* mandate means following rules that rank the importance of various sources of evidence that disclose the "true" meaning of claim terms.

The Federal Circuit summarized its view of proper claim construction in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). Intrinsic evidence, which includes the patent and its prosecution history, is the primary source from which to derive a claim's meaning.[3] *Id.* at 1314. The court's task is to determine the "ordinary and customary meaning" of the terms of a claim in the eyes of a person of ordinary skill in the art on the filing date of the patent. *Id.* at 1313 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In its review of intrinsic

---

[3] A patent includes three parts: (1) a "written description," which consists of an often lengthy exposition of the background of the invention, at least one embodiment of the invention, and other written material that assists in understanding how to practice the invention; (2) in most cases, a set of drawings that illustrates portions of the written description; and (3) the claims, which delimit the scope of the invention. *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992). Together, these three components make up the patent's "specification." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1384 (Fed. Cir. 1999); 35 U.S.C. § 112. Although 35 U.S.C. § 112 refers to the claims as part of the specification, many courts and practitioners use the term "specification" to refer to all portions of a patent except the claims. *See* 35 U.S.C. § 112(b).

evidence, the court should begin with the language of both the asserted claim and other claims in the patent. *Phillips*, 415 F.3d at 1314; *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("[C]laim construction analysis must begin and remain centered on the claim language itself.").

The court must read claim language in light of the remainder of the patent's specification. *Phillips*, 415 F.3d at 1316 (explaining that "the specification necessarily informs the proper construction of the claims"). The specification acts as a "concordance" for claim terms and is thus the best source beyond the claim language for understanding those terms. *Id.* at 1315. The inventor is free to use the specification to define claim terms as he or she wishes, and the court must defer to the inventor's definitions. *Id.* at 1316 ("[T]he inventor's lexicography governs."). The court should "rely heavily" on the specification in interpreting claim terms. *Id.* at 1317. The court should not, however, commit the "cardinal sin" of claim construction—impermissibly reading limitations from the specification into the claims. *Id.* at 1320 (citing *SciMed Life Sys. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). Although a court should limit the meaning of a claim where the "specification makes clear at various points that the claimed invention is narrower than the claim language might imply," the court must not read particular embodiments and examples appearing in the specification into the claims unless the specification requires it. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988). Additionally, although figures illustrating the invention may be used in construing claims, "the mere fact that the

patent drawings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration." *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1148 (Fed. Cir. 2003).

The Federal Circuit has continued to emphasize the importance of reading the claims in the context of the specification and prosecution history.[4] *Laryngeal Mask Co. Ltd. v. Ambu*, 618 F.3d 1367, 1370 (Fed. Cir. 2010) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art in question at the time of the invention when read in the context of the specification and prosecution history."). Although the patent's prosecution history is also intrinsic evidence, it is generally "less useful for claim construction purposes" than the specification. *Phillips*, 415 F.3d at 1317.

Finally, the court can consider extrinsic evidence, "including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980) (internal quotation marks omitted). For a variety of reasons, extrinsic evidence is usually "less reliable than the patent and its prosecution history" as a source for claim interpretation. *Id.* at 1318. The court need not admit extrinsic evidence but may do so at its discretion. *Id.* at 1319.

//

//

---

[4] The prosecution history exists independently of the patent. It consists of the inventor's application to the United States Patent and Trademark Office ("PTO") and all correspondence between the PTO and the inventor documenting the invention's progress from patent application to issued patent. *Vitronics*, 90 F.3d at 1582.

## B.    Disputed Terms

### 1.    front portion

The claim term "front portion" appears in claims 1, 5, 9, and 11 of the '030 Patent and claims 1, 5, 9, 11, and 12 of the '496 Patent. ('030 Patent at 8:18, 21, 24, 29-30, 39, 41-42, 45, 58; *id.* at 9:1-2, 13; '496 Patent at 8:14, 17, 20-21, 26-27, 35, 37-38, 41, 55-56, 66-67; *id.* at 9:12, 15-16.) Illustratively, claim 1 of the '030 Patent recites: "[a] male garment comprising:  a body including a front portion and having leg openings for the wearer's legs, the body including a crotch panel extending between the leg openings and joined to the front portion along a first seam." ('030 Patent at 8:17-21; *see also* '496 Patent at 8:13-17.)

The parties propose the following constructions of the claim term "front portion":

**Plaintiffs' Proposed Construction:** "region of the garment's body that is situated in front of the wearer when the garment is worn and to which the stretch panel is attached to form a concave space between the front portion and the stretch panel capable of receiving the wearer's genitals." (Pl. Br. at 4.)

**Defendants' Proposed Construction:** "the outermost layer of fabric of the body of the male garment bounded by the side seams, waistband seam, and first seam." (Def. Br. at 2.)

The parties agree that the front portion is part of the garment's body and is situated in front of the wearer when the Invention is worn. (*See* Pl. Br. at 4; Def. Br. at 2.) However, the parties dispute two issues concerning the front portion:  (1) whether the front portion consists only of the Invention's outermost layer of fabric, and (2) whether

the front portion is bounded laterally by the side seams and longitudinally by the first

seam and the waistband seam.  (*See* Pl. Resp. at 2-6; Def. Resp. at 1-7.)  The court

addresses these issues in turn.

Defendants argue that the front portion necessarily consists of the "the outermost

layer of the undergarment's body."  (Def. Br. at 2 (emphasis omitted).)  As Defendants

acknowledge, the words "outermost" and "layer" do not appear in the claim language or

the specification.  (*See* Tr. at 10:14-11:8; *see generally* '030 Patent; '496 Patent.)

Defendants premise their proposed construction on the drawings in the specification and

an episode of prosecution history.  (*See* Def. Br. at 2-4.)

As to the drawings, Defendants argue that Figures 5 through 7, which appear in

both Patents, "depict the front panel no differently than the rest of the undergarment's

body—as a single sheet of fabric . . . ."  (*Id.* at 2-3; *see also* '030 Patent at Figs. 5-7; '496

Patent at Figs. 5-7.)  That assertion is speculative.  The court finds it impossible to

determine whether the drawings depict the front portion as having one layer or multiple

layers of fabric.  (*See* '030 Patent at Figs. 5-7; '496 Patent at Figs. 5-7.)  In any event, the

drawings merely illustrate a preferred embodiment.  (*See* '030 Patent at 2:32-33 (noting

that the Figures depict "undershorts . . . according to an example embodiment").)  Even

assuming the drawings show the front portion as consisting of a single layer of fabric, the

court would contravene a fundamental principle of claim construction were it to import

that limitation into its construction of "front portion."  *See Philips*, 415 F.3d at 1320

(explaining that the court must refrain from reading into the claim limitations drawn from

an embodiment).

1    Defendants' reliance on the prosecution history is also unavailing.  During the

2    prosecution of the application that issued as the '030 Patent, the Patent and Trademark

3    Office ("PTO") examiner suggested that the applicant "possibly include language that

4    defined the seam structure of the stretch panel to the outer pouch such that there is no

5    opening on the outermost layer."  (Jt. Cl. Chart, Ex. 4 (Dkt. # 47-6) at 43.[5])  Defendants

6    argue that the applicant "followed the examiner's instruction and added additional

7    structural language defining the contours of the 'outer pouch' or 'outermost layer'—*i.e.*,

8    the front portion . . . ."  (Def. Br. at 3.)  Specifically, Defendants point to a submission to

9    the PTO in which the patentee stated that, "as suggested by the Examiner, claim 1 now

10   recites that side edges of the stretch panel are 'attached to the body at side seams

11   extending substantially continuously along either side of the front portion from the first

12   seam to the waistband.'"  (*Id.* (quoting Jt. Cl. Chart, Ex. 4 at 30).)  According to

13   Defendants, because the applicant "never disputed the 'outermost layer' language"

14   employed by the examiner, the court must incorporate that limitation into its construction

15   of "front portion."  (*See* Tr. at 12:15-20.)

16       Defendants fail to show that this episode of prosecution history is relevant to their

17   argument that the front portion necessarily consists of the outermost layer of fabric.  The

18   language the applicant added to claim 1 appears to have been intended to distinguish the

19   application that issued as the '030 Patent from prior art.  (*See* Jt. Cl. Chart, Ex. 4 at 30.)

20   Indeed, the applicant expressly explained that claim 1 was amended to recite that the side

21

22   ───────────────
     [5] When citing exhibits related to the Joint Claim Chart, the court cites the page number
     generated by the court's electronic filing system.

edges of the stretch panel are "attached to the body at side seams extending substantially continuously along either side of the front portion . . ." in an effort to "distinguish[] the Reis references [U.S. Patent No. 2,235,849] which require non-continuous side seams to provide a fly." (*Id.*) It would be a leap too far to find that, in clarifying the attachment of the stretch panel to the front portion, the applicant implicitly adopted as a claim limitation the examiner's reference to the "outermost layer" of the pouch. *See, e.g.*, *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 69 F. Supp. 2d 309, 316 (D. Conn. 1998) (declining to define a limitation pursuant to a "single comment" the examiner made during the patent prosecution). The court thus rejects Defendants' proposed "outermost layer" limitation as unfounded.[6]

The parties also dispute the lateral and longitudinal parameters of the garment's front portion. Plaintiffs contend that Defendants' proposal to define "front portion" as "bounded by the first seam, waistband seam, and side seams" is inconsistent with the claim language, specification, and "plain meaning" of the claim term, none of which limit "front portion" to the part of the garment between the four specific seams Defendants emphasize. (Pl. Br. at 8; *see also* Tr. at 9:7-15.) Defendants assert that Plaintiffs'

//

---

[6] Plaintiffs also argue that the prosecution history includes a "discussion . . . of a two-layer 'front portion'" centered on Reis. (Pl. Br. at 6 (citing Jt. Cl. Chart at 2, Ex. 3 at 63-64).) Defendants dispute Plaintiffs' characterization of that part of the prosecution history. (Def. Resp. at 8-10.) Having rejected Defendants' proposed "outermost layer" limitation, the court does not reach the parties' disagreement on that point. Additionally, the court does not reach the parties' arguments that their respective dictionary definitions of "front" weigh in favor or against limiting the front portion to the garment's outermost layer. (*See* Pl. Br. at 7 n.3; Def. Br. at 5.)

proposed construction would sweep in any portion of the garment forward of the wearer

and is thus overbroad. (Def. Br. at 3-4.)

To support their contention that the sides of the front portion are bounded by the

side seams, Defendants rely primarily on claim language that describes the way the

stretch panel attaches to the front portion. (*See* Def. Resp. at 5.) Claim 1 of both Patents

discloses "a stretch panel . . . having . . . side edges attached to the body at side seams

extending substantially continuously along either side of the front portion . . . ." ('030

Patent at 8:24-34; '496 Patent at 8:21-27.) According to Defendants, in light of this

claim language, the side edges of the stretch panel necessarily define the boundaries of

the front portion: "If the front [portion] were to extend beyond the side seams, the side

seams connecting the stretch panel would not 'extend[] substantially continuously along

either side of the front portion.'" (Def. Resp. at 5-6 (quoting '030 Patent at 8:29-30)

(emphasis omitted).)

The court is not convinced. Although the claim language specifies the lateral

boundaries of the stretch panel, it does not specify the lateral boundaries of the front

portion. Notably, the Patents refer to "the side edges" of the stretch panel but do not refer

to the "side edges" of the front portion; rather, the Patents explain that the side edges of

the stretch panel run along "either side of the front portion." (*See* '030 Patent at 8:28-30;

'496 Patent at 8:24-26.) Had the inventor wanted to specify that the front portion is

bounded by the side seams, the inventor could have disclosed a stretch panel having side

edges attached to the body along the side *edges* of the front potion. *Cf. Applied Med.*

*Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) ("[T]he use

of two terms in a claim requires that they connote different meanings."). The inventor did not so specify, and the court declines to adopt that unspoken limitation here.

Defendants also argue that the front portion must extend longitudinally from the first seam—the seam where the crotch panel meets the front portion—to the waistband seam. The limitation regarding the first seam is already expressed in the surrounding claim language and need not be reiterated in the construction of "front portion." (*See* '030 Patent at 8:18-20 (claiming "a crotch panel . . . joined to the front portion along a first seam"); '496 Patent at 8:15-17); *see also CAAS Techs., LLC v. Envision Telephony, Inc.*, No. C15-0624JLR, 2016 WL 3199540, at *10 (W.D. Wash. June 6, 2016) (rejecting a proposed construction because it "seeks to incorporate context that is expressly included in the claim's language"). Moreover, although the drawings in the specification support the notion that the top of the front portion extends to the waistband seam, the claim language discloses no such limitation. (*See generally* '030 Patent; '496 Patent.) The court thus declines to construe "front portion" to extend longitudinally from the first seam to the waistband seam.

Defendants appear to contend that any construction of "front portion" that does not delineate the front portion's "boundaries" as commensurate with the stretch panel is overbroad. (*See* Tr. at 14:4-10.) But, as discussed above, the court finds no grounds in the claim language that supports so precise a delineation of the front portion's boundaries. Nor does the court find a basis in the claim language to otherwise delimit the length and breadth of the front portion.

//

1    Having disposed of the two limitations integral to Defendants' construction of

2  "front portion," the court finds that the claim term does not require construction. The

3  court is not to make a construction that "contribute[s] nothing but meaningless verbiage

4  to the definition of the claimed invention." *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149,

5  1152 (Fed. Cir. 1997).  Claim construction is required only "when the meaning or scope

6  of technical terms and words of art is unclear . . . and requires resolution in order to

7  determine" the issue.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed.

8  Cir. 1997).  Accordingly, "[i]f the claim language is clear on its face, then [the court's]

9  consideration of the rest of the intrinsic evidence is restricted to determining if a

10  deviation from the clear language of the claims is specified."  *Interactive Gift Express,*

11  *Inc. v. Compuserv Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001).  Here, neither party has

12  provided evidence that "front portion" has a special meaning in the art of the Patents.

13  (*See generally* Pl. Br.; Def. Br.; Pl. Resp.; Def. Resp.)  Nor does the court's review of the

14  intrinsic evidence suggest that the claim term carries something other than its plain and

15  ordinary meaning "in common parlance."  *See Summit 6, LLC v. Samsung Elecs. Co.*, 802

16  F.3d 1283, 1291 (Fed. Cir. 2015).  The court thus declines to construe the claim term

17  "front portion."

18        2.  stretch panel

19        The claim term "stretch panel" appears in claims 1-5, 7, 9, 11, 13, and 14 of the

20  '030 Patent and claims 1-5, 7, 9, 11, 13, and 14 of the '496 Patent.  (*See* '030 Patent at

21  8:23-24, 35, 37, 44-45, 48-50, 53-56, 60, 64-65; *id.* at 9:7, 12-13, 15, 20-22; '496 Patent

22  //

at 8:20, 31, 33, 39-41, 44-46, 49-52, 57, 61-62; *id.* at 9:1, 4-5, 10-11, 13, 21, 22-23.)

Claim 1 of the '030 Patent claims:

> a stretch panel attached to the body inside the front portion, the stretch panel comprising a sheet of elastically resilient four-way stretch material having a top edge attached to the body at the waistband seam, a bottom edge attached at the first seam, side edges attached to the body at side seams extending substantially continuously along either side of the front portion from the first seam to the waistband seam and an opening for receiving the wearer's genitals . . . .

('030 Patent at 8:23-31.)  Likewise, claim 1 of the '496 Patent discloses "a stretch panel attached to the body inside the front portion."  ('496 Patent at 8:20-21.)  In contrast to the '030 Patent, the '496 Patent claims a stretch panel with a top edge attached to the body "at a top location" and a bottom edge attached to the body "at a bottom location."  (*Id.* at 8:22-24.)

The parties propose the following constructions of the claim term "stretch panel":

**Plaintiffs' Proposed Construction:**  "four-way stretch material separate from and joined to the inside of the garment's body that includes an opening for the wearer's genitals."

**Defendants' Proposed Construction:**  Plain and ordinary meaning.

The parties dispute whether the court should construe this claim term.  Defendants argue that, given the extensive claim language surrounding "stretch panel," a juror would readily understand the meaning of the claim term as would a person of ordinary skill in the art.  (Def. Br. at 21-22.)  Plaintiffs, in contrast, argue that Defendants' position that "stretch panel" need not be construed conceals a dispute about whether the stretch panel is "separate" from the garment's body.  (Pl. Br. at 9.)

Plaintiffs' proposed construction would expressly specify that the stretch panel is "separate from and joined to the inside of the garment's body." (*See id.*) But there is no need to construe the claim to include that limitation. The surrounding claim language makes clear that the stretch panel is not part of the body of the garment but rather constitutes a panel of fabric that is itself attached to the front portion. Claim 1 of the Patents recites a "stretch panel comprising a sheet of . . . material having a top edge . . . , a bottom edge . . . , [and] side edges . . . ." ('030 Patent at 8:24-28; '496 Patent at 8:21-25.) In other words, the stretch panel contains at least one discrete piece of material with four distinct edges. Additionally, claim 1 of the Patents explains that the stretch panel is "attached to the body inside the front portion." ('030 Patent at 8:23-24; '496 Patent at 8:20-21.) Plaintiffs' integration of the limitation "separate from and joined to the inside of the garment's body" into the claim term is therefore redundant, and the court declines to adopt it. *See Symantec Corp. v. Acronis, Inc.*, No. C-11-5310 EMC, 2013 WL 752472, at *2 (N.D. Cal. Feb. 27, 2013) (rejecting a party's proposed construction as "redundant given the surrounding words of the claim"); *see also CAAS*, 2016 WL 3199540, at *10.

Plaintiffs' proposed construction articulates two additional limitations: (1) the stretch panel must "include[] an opening for the wearer's genitals," and (2) the stretch panel must comprise "four-way stretch material." (Pl. Br. at 8-10.) Again, these limitations appear in the surrounding claim language. First, claim 1 of each Patent provides that the stretch panel has "an opening for receiving a wearer's genitals." ('030 Patent at 8:31; '496 Patent at 8:27-28.) Second, the Patents explain that the stretch panel

comprises "a sheet of elastically resilient four-way stretch material." ('030 Patent at 8:24-25; '496 Patent at 8:21-22.)  The court sees no need to construe "stretch panel" in a way that merely restates what the surrounding claim language clarifies.

The court agrees with Defendants that it need not construe the claim term "stretch panel."  Neither party suggests that the claim term carries anything other than its plain and ordinary meaning in the context of the asserted claims, and the intrinsic evidence is consistent with that meaning.  *See Ethicon, Inc.*, 103 F.3d at 1568; *Samsung Elecs.*, 802 F.3d at 1291.  Moreover, the parties present no substantive disagreement about the scope of the claim term.[7]  At the *Markman* hearing, counsel for Defendants agreed that "the stretch panel is a piece—or . . . pieces—of fabric distinct from the body of the garment." (Tr. at 18:8-12.)  Likewise, counsel for Plaintiffs suggested that affording "stretch panel" its plain and ordinary meaning "would be adequate," as long as the court acknowledges that the stretch panel "has to be inside" the front portion.  (*Id.* at 16:2-9.)  As discussed above, the claim language is definitive on that point.  The court thus declines to construe the claim term "stretch panel."

3.  crotch panel

The claim term "crotch panel" appears just once in the claims of each Patent. Claim 1 of each Patent discloses "a body including a front portion and having leg openings for a wearer's legs, the body including a crotch panel extending between the leg

---

[7] Accordingly, this case is not like *O2 Micro International Ltd. v. Beyond Innovation Technology Co.*, where the Federal Circuit held that district courts must construe even common terms where there is "more than one 'ordinary' meaning," or where the "'ordinary' meaning does not resolve the parties' dispute."  521 F.3d 1351, 1361 (Fed. Cir. 2008).

openings and joined to the front portion along a first seam." ('030 Patent at 8:18-21; '496 Patent at 8:14-17.)

The parties propose the following constructions of the claim term "crotch panel":

**Plaintiffs' Proposed Construction:**  "fabric separate from and joined to both the front portion and the back side of the garment's body in the region that is adjacent to the wearer's crotch when the garment is worn."

**Defendants' Proposed Construction:**  Plain and ordinary meaning.

Plaintiffs argue that Defendants' reliance on a plain meaning construction of this claim term "obscures a dispute between the parties over whether the crotch panel is required to be a separate component of the body of the undergarment attached by seams to the front portion and the back side of the body." (Pl. Br. at 17.)  According to Plaintiffs, the court should resolve that dispute by construing "crotch panel" to expressly include four limitations:  the crotch panel must be (1) a separate panel of fabric that is both (2) joined to the front portion and (3) joined to the "back side of the garment's body," and is (4) "adjacent to the wearer's crotch when the garment is worn." (*Id.* at 17-18.)  The court addresses these limitations in turn.

Plaintiffs' first proposed limitation—that the crotch panel be a "separate" panel of fabric—is redundant and uncontested.  The word "panel" itself implies that the crotch panel is a separate fabric component.  The specification is consistent with this understanding.  For example, the embodiment illustrated in Figure 3 of both Patents "includes a crotch panel . . . joined by seams . . . to the front and back sides" of the body of the garment. ('030 Patent at 2:51-54; *id.* at Fig. 3; *see also* '496 Patent at 2:48-51; *id.*

at Fig. 3.)  Both the drawing and the specification's written description indicate that the crotch panel is a swath of fabric separate from the other components of the garment's body.  (*See id.*)  The parties appear to agree on this point.  At the *Markman* hearing, counsel for Defendants did not dispute that the crotch panel is "a separate panel" of fabric.  (Tr. at 24:17-18.)  Because the crotch panel's status as a distinct, separate component of the garment's body is indicated by the plain meaning of the word "panel," and because the parties do not dispute that understanding, the court finds it unnecessary to construe "crotch panel" as "fabric separate from . . . the garment's body."  (*See* Pl. Br. at 17.)

Additionally, Plaintiffs argue that the court should define "crotch panel" to make clear that the crotch panel is "joined to . . . the front portion" of the garment's body.  (*Id.*)  The surrounding claim language already expresses that limitation.  Claim 1 of both Patents states that the "crotch panel . . . [is] joined to the front portion along a first seam."  ('030 Patents at 8:19-21; '496 Patent at 8:15-17.)  The court declines to construe "crotch panel" in a way that echoes what is unambiguously explained in the surrounding claim language.  *See Symantec*, 2013 WL 752472, at *2; *CAAS*, 2016 WL 3199540, at *10.

Plaintiffs further urge the court to construe "crotch panel" as a panel of fabric "joined to . . . the back side of the garment's body."  (Pl. Br. at 17.)  As noted above, the preferred embodiment described in the specification features "a crotch panel joined by seams to the front and back sides of the body respectively."  ('030 Patent at 2:51-54; '496 Patent at 2:48-51.)  But the words "back side[]" do not appear in the Patents' claims.  (*See generally* '030 Patent at 8:16-9:26; '496 Patent at 8:12-9:27.)  In fact, the

specification indicates that the Invention need not have a back side, at least in the way Plaintiffs appear to use that phrase. Specifically, the specification provides that "[i]t is not mandatory that the garment include a body that covers a wearer's buttocks" and cites "athletic supporters (jock straps)" as an example embodiment. ('030 Patent at 8:5-8; '496 Patent at 8:1-4.) Construing "crotch panel" to require that it be "joined to . . . the back side of the garment's body" would exclude embodiments wherein the body does not cover the wearer's buttocks. The court thus rejects that aspect of Plaintiffs' proposed construction. *See Vitronics Corp.*, 90 F.3d at 1583 (noting that a construction of a claim in which an embodiment falls outside of the proposed construction "is rarely, if ever correct").

Finally, Plaintiffs propose that the court construe "crotch panel" to indicate that the crotch panel is "adjacent to the wearer's crotch when the garment is worn." (Pl. Br. at 17.) That limitation is implied by the plain and ordinary meaning of the word "crotch." Given the meaning of "crotch" in common parlance, as well as the surrounding claim language, the court is persuaded that a lay jury would readily understand how the crotch panel is positioned with respect to the anatomy of the wearer. The court therefore declines to specify that the crotch panel is "adjacent to the wearer's crotch when the garment is worn."

In sum, the four limitations Plaintiffs propose are either redundant or erroneous. The court therefore considers Defendants' proposal to afford "crotch panel" its plain and ordinary meaning. The court is mindful that it must construe even common terms where there is "more than one 'ordinary' meaning," or where the "'ordinary' meaning does not

resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Neither circumstance is present here. Plaintiffs do not argue that the term "crotch panel" yields multiple ordinary meanings. (*See generally* Pl. Br.; Pl. Resp.) Nor do the parties present a dispute that the ordinary meaning of the claim term does not resolve. To the extent the parties disagree about whether the crotch panel is a "separate" panel of fabric, the ordinary meaning of "panel" resolves that issue in the affirmative. Furthermore, no party has indicated that a person of ordinary skill in the art would understand the term "crotch panel" to carry a meaning other than its plain and ordinary meaning, and the intrinsic evidence is consistent on that point. The court thus declines to construe the claim term "crotch panel."

### 4-5. top location and bottom location

The claim terms "top location" and "bottom location" appear in claims 1 and 5 of the '496 Patent and are best addressed together. (*See* '496 Patent at 8:23, 35-36, 53-54.) Unlike claim 1 of the '030 Patent, claim 1 of the '496 Patent does not require that the top and bottom edges of the stretch panel be attached to the garment's waistband seam and first seam, respectively; rather, the '496 Patent requires that the top edge of the stretch panel be "attached to the body at a top location" and the bottom edge of the stretch panel be "attached to the body at a bottom location." ('496 Patent at 8:23-24.) The terms "top location" and "bottom location" were added in a February 6, 2018, amendment to the claims of the application that issued as the '496 Patent, in response to a statutory double patenting rejection over the '030 Patent by the PTO. (*See* Jt. Cl. Chart, Ex. 6 (Dkt. # 47-8) ("2/6/18 Am.") at 35-38.)

The parties propose the following constructions of the claim terms "top location" and "bottom location":

**Top location**

**Plaintiffs' Proposed Construction:** Plain and ordinary meaning. Alternatively, "region where the top edge of the stretch panel is attached to the front portion of the body of the garment."

**Defendants' Proposed Construction:** "the seam connecting the body of the male garment and the stretch panel to the waistband."

**Bottom location**

**Plaintiffs' Proposed Construction:** Plain and ordinary meaning. Alternatively, "region where the bottom edge of the stretch panel is attached to the front portion of the body of the garment."

**Defendants' Proposed Construction:** "the seam connecting the crotch panel and the stretch panel to the front portion."

The court begins by reviewing Defendants' proposed constructions. Defendants insist that the court must define "top location" as the seam where the stretch panel is connected to the waistband—*i.e.*, the waistband seam. (Def. Br. at 5-9.) Likewise, Defendants contend that the court must define "bottom location" as the seam where the stretch panel and crotch panel are connected to the front portion—*i.e.*, the first seam. (*Id.* at 9-11.) Put otherwise, Defendants' proposed constructions would leave no functional difference between the '030 and '496 Patents: both would claim a stretch panel whose top edge is attached to the waistband seam and whose bottom edge is attached to the first

seam. Defendants argue that this equivalence of claim meaning is warranted because the specification of the '496 Patent, which is essentially the same as that of the '030 Patent, does not support a broader construction of "top location" and "bottom location" than the '030 Patent. (*Id.* at 6-8; Def. Resp. at 12-13.)  Defendants correctly note that the '496 Patent's specification is substantially identical that of the '030 Patent and that the '496 Patent's specification describes no embodiments in which the top and bottom edges of the stretch panel are attached anywhere but the waistband seam and first seam, respectively. (*See generally* '496 Patent.)

At the *Markman* hearing, Defendants argued that the Federal Circuit's decision in *Wang Laboratories, Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999), compels the court to adopt their proposed constructions. (*See* Tr. at 30:16-31:4, 32:23-6.)  In *Wang*, the claim term at issue was "frame," as applied to a computer application. 197 F.3d at 1381.  Although the parties agreed in the abstract that the term could refer to both "character-based systems" and "bit-mapped display systems," the specification of the patent-in-suit described only a character-based system. *Id.* at 1381-82.  The court concluded that the specification "would not be . . . understood by a person skilled in the field of the invention" to encompass bit-mapped display systems in the applicant's invention. *Id.* at 1382.  In so finding, the court emphasized that "claims are not properly construed to have a meaning or scope that would lead to their invalidity for failure to satisfy the requirements of patentability," and, "[a]lthough . . . a claim is not invalid simply because it embraces subject matter that is not specifically illustrated, in order to be covered by the claims[,] that subject matter must be sufficiently described as

the applicant's invention to meet the requirements of section 112." *Id.*  The *Wang* court

found that requirement was not satisfied as to systems other than character-based

systems.  *Id.*

Defendants argue that *Wang* requires the court to construe the claim terms "top

location" and "bottom location" as synonymous with "waistband seam" and "first seam,"

respectively, because the specification does not support broader readings of the terms.

The court disagrees.  The *Wang* court enumerated several considerations, including "the

context of the specification" and the prosecution history, that bear on the breadth to

which a claim term is entitled when the term purports to embrace subject matter not

specifically illustrated in the specification.  *Wang*, 197 F.3d at 1383.  In that case, the

court concluded that the prosecution history of the patent-in-suit showed that the

inventors disclaimed a claim construction that would encompass bit-mapped systems,

bolstering its conclusion that the claim term was limited to character-based systems.  *Id.*

at 1383-84.  Here, the prosecution history weighs in the opposite direction:  it shows that

Plaintiffs intended to broaden the scope of the claim terms at issue to overcome the

PTO's double-patenting rejection over the '030 Patent.  (*See* 2/6/18 Am. at 35-38.)

Factually, then, this case is distinct from *Wang*.  (*See id.*); *see also Home Diagnostics,*

*Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357-58 (Fed. Cir. 2004) (explaining that, in

changing the scope of claim terms across generations of a patent family, the patentee

//

//

//

"purposely sought" a "broader" claim scope and was "entitled to the full scope of its claim language").[8]

The court further finds that Defendants' arguments concerning the proper construction of "top location" and "bottom location" boil down to invalidity contentions, not claim construction arguments. According to Defendants, "[i]f 'top location' means something different from 'waistband seam,' the amendment adding it to claims 1 and 5 of the '496 Patent would constitute 'new matter' introduced after the filing date of the original application," in violation of 35 U.S.C. § 132(a). (Def. Br. at 8); *see also* 35 U.S.C. § 132(a) ("No amendment shall introduce new matter into the disclosure of the invention."). Relatedly, Defendants argue that any constructions of "top location" and "bottom location" that are broader than "waistband seam" and "first seam," respectively,

//

//

---

[8] Defendants argue that *Home Diagnostics* is inapposite because, in that case, the court found that the specification made clear that the preferred embodiments described therein "d[id] not limit the broader claim language." 381 F.3d at 1357; (Def. Resp. at 12.) According to Defendants, "[u]nlike *Home Diagnostics*, the specification here does not teach at all that the top and bottom edges of the stretch panel would attach anywhere but the waistband seam and first seam, respectively." (Def. Resp. at 12-13.) The court acknowledges that language in the specification of the patent-at-issue in *Home Diagnostics* expressly alluded to additional methods of practicing the invention that were not encompassed by the preferred embodiments. 381 F.3d at 1357. Plaintiffs have not pointed to similar language in the '496 Patent, apart from the Patent's statement that "the invention may be practiced without the[] particulars" illustrated in the specification. (*See generally* Pl. Br.; Pl. Resp.; '496 Patent at 2:21-22.) Nonetheless, Defendants have not persuaded the court that it is free to disregard *Home Diagnostic*'s central insight: "A patentee may claim an invention broadly and expect enforcement of the full scope of that language absent a clear disavowal or contrary definition in the specification." 381 F.3d at 1357. Here, the absence of a clear disavowal of claim scope in the specification, and the prosecution history, weigh in favor of affording Plaintiffs the full scope of the '496 Patent's claim language. *See id.*

would fail for lack of written description under 35 U.S.C. § 112(1).[9]  (Def. Br. at 8; Resp. at 12.)  The addition of new matter to a patent application and compliance with the written description requirement are questions of fact.  *See Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech. (USA), Inc.*, 542 F.3d 1363, 1380 (Fed. Cir. 2008); *Invitrogen Corp. v. Contech Labs., Inc.*, 429 F.3d 1052, 1072 (Fed. Cir. 2005).  Neither issue has been thoroughly addressed in the record before the court, and the court finds that these arguments are better suited for disposition after the claim construction phase, on a more complete record.  *See, e.g.*, *Reiffin v. Microsoft Corp.*, No. C-98-0266 VRW, 2002 WL 31268220, at *6-7 (N.D. Cal. April 30, 2002) (declining to consider the defendant's "new matter" argument during claim construction because it would require the court to "disregard the language of the claims as issued"); *see also Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.").

Having disposed of Defendants' proposal to construe "top location" and "bottom location" as synonymous with "waistband seam" and "first seam," respectively, the court turns to the intrinsic evidence.  The court finds that the claim terms "top location" and "bottom location" speak for themselves and are readily understood in the context of the

---

[9] Under the Leahy-Smith American Invents Act ("AIA"), Paragraphs 1 and 2 of 35 U.S.C. § 112 were replaced with the newly designated §§ 112(a) and (b).  *See* Pub. L. 112-29, § 4(c), 125 Stat. 285, 296; 35 U.S.C. §§ 112(a), (b).  Because the '496 Patent is a continuation of the '030 Patent, which issued from an application filed before March 16, 2013, the pre-AIA 35 U.S.C. § 112 applies.  *See id.* § 3(n)(1), 125 Stat. at 293; *X One, Inc. v. Uber Techs., Inc.*, No. 16-CV-06050-LHK, 2017 WL 3581184, at *27 n.1 (N.D. Cal. Aug. 18, 2017) (noting that pre-AIA § 112 applies to patents that are continuations of applications filed under the pre-AIA regime).

surrounding claim language.  (*See* '496 Patent at 8:22-23 (explaining that the top edge of the stretch panel "attach[es] to the body at a top location"); *id.* at 8:23-24 (explaining that the bottom edge of the stretch panel "attach[es] to the body at a bottom location").) Moreover, neither side argues that a person of ordinary skill in the art would understand the claim terms to mean something different than their customary meaning.  (*See generally* Pl. Br.; Def. Br.; Pl. Resp.; Def. Resp.)  The court thus declines to construe "top location" and "bottom location."

6.      substantially continuously along either side of the front portion

The claim term "substantially continuously along either side of the front portion," which appears in claim 1 of each Patent, describes the attachment of the stretch panel to the front portion of the garment.  (*See* '030 Patent at 8:27-30; '496 Patent at 8:25-27.) Specifically, claim 1 of the '030 Patent discloses "a stretch panel attached to the body inside the front portion, the stretch panel comprising . . . side edges attached to the body at side seams extending substantially continuously along either side of the front portion from the first seam to the waistband seam . . . ."  ('030 Patent at 8:23-30.)  Similarly, claim 1 of the '496 Patent discloses "a stretch panel attached to the body inside the front portion, the stretch panel comprising . . . side edges attached to the body at side seams extending substantially continuously along either side of the front portion . . . ."  ('496 Patent at 8:20-28.)  The claim term does not appear in the Patents' specification.

The parties propose the following constructions of the claim term "substantially continuously along either side of the front portion":

//

**Plaintiffs' Proposed Construction:** Plain and ordinary meaning. Alternatively: "each side seam attaches one side edge of the stretch panel to the inside of the front portion of the garment's body."

**Defendants' Proposed Construction:** "largely, but not necessarily wholly, uninterrupted along the entire length of each side of the front portion."

The parties' dispute centers on Defendants' position that the side seams attaching the stretch panel to the front portion must extend "along the *entire length* of each side of the front portion." (Def. Br. at 11 (emphasis added).) Plaintiffs argue that Defendants' proposed construction is erroneous because it is inconsistent with the claim language of the '496 Patent, which requires only that the stretch panel attach at a top and bottom location—not the waistband seam and the first seam and, by extension, "not all the way up and down the front portion." (Pl. Br. at 16.) Defendants, for their part, assert that the prosecution history of the '030 Patent requires the court to construe the claim term to reflect that the side seams run along the full length of the front portion. (Def. Br. at 11-12; *see also* Def. Resp. at 17.)

Defendants' proposed construction is facially inconsistent with the claim language of the '496 Patent. As discussed above, the '496 Patent claims a stretch panel with a top edge attached to a "top location," rather than the waistband seam, and a bottom edge attached to a "bottom location," as opposed to the first seam. *See supra* § III.B.4-5. The court has already rejected Defendants' proposal to construe "top location" and "bottom location" as synonymous with "waistband seam" and "first seam," respectively, and found that, for claim construction purposes, Plaintiffs are entitled to the full scope of

those claim terms.  *See id.*  The '496 Patent thus covers an undergarment in which the stretch panel attaches to the body of the garment at a point below the waistband seam and above the first seam—and, accordingly, the seams along the sides of the stretch panel do not run the "entire length" of the front portion.  (*See* '496 Patent at 8:20-27.)  Defendants' proposed construction of the "substantially continuously" claim term would exclude such embodiments.

Defendants make much of the prosecution history of the '030 Patent.  (*See* Def. Br. at 11-13.)  During the prosecution of the application that issued as the '030 Patent, the PTO examiner rejected claim 1 as unpatentable over U.S. Patent No. 2,235,849 ("Reis").  (Jt. Cl. Chart, Ex. 4 at 8-9.)  In a subsequent interview with the applicant, the examiner suggested that the applicant "possibly include language that defined the seam structure of the stretch panel to the outer pouch such that there is no opening on the outermost layer."  (*Id.* at 43.)  The applicant then amended claim 1 to recite that the side edges of the stretch panel are "attached to the body at side seams extending substantially continuously along either side of the front portion from the first seam to the waistband."  (*Id.* at 24.)  The applicant explained that this amendment "distinguishes the Reis references[,] which require non-continuous seams to provide a fly."  (*Id.* at 30.)  This amended language was present in claim 1 of the application that issued as the '496 Patent.  (Jt. Cl. Chart, Ex. 6 at 14.)  The applicant subsequently amended the claims in response to a statutory double patenting rejection over the '030 Patent, deleting "from the first seam to the waistband seam" after the "substantially continuously" term in claim 1.  (*Id.* at 36.)

//

Defendants argue that the prosecution history of the '030 Patent applies with equal force to the '496 Patent. (Def. Br. at 12.) According to Defendants, "[i]n the '030 Patent's prosecution, the 'substantially continuously' term was necessary to overcome prior art references with 'non-continuous side seams to provide a fly,'" including Reis. (*Id.*) Defendants thus assert that, although the "substantially continuously" claim term in the '496 Patent does not include the phrase "from the first seam to the waistband seam," it nevertheless carries the same meaning as the "substantially continuously" claim term in the '030 Patent. (*Id.* at 12-13.)

Defendants' logic is unavailing. Defendants correctly note that, "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." (*Id.* (quoting *Elkay Mfg. Co. v. EBCO Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999)).) Here, however, the limitations disclosed by claim 1 of the '030 Patent and the '496 Patent are not the same: unlike the '030 Patent, the '496 Patent does not require that the side seams along the stretch panel extend "from the first seam to the waistband seam." (*Compare* '030 Patent at 27-30, *with* '496 Patent at 8:25-27.) The court will not read into the '496 Patent a claim limitation that the Patent was amended to discard. Moreover, the applicant's original addition of the "substantially continuously" claim term to the application that issued as the '030 Patent has little bearing on the dispute between the parties here: whether the side seams on the stretch panel must extend from the first seam to the waistband seam. The amendment appears to have been intended to distinguish the Invention from prior art in which the

stretch panel was attached by "non-continuous side seams" to create a fly, an issue not implicated in the construction of this claim term.  (*See* Jt. Cl. Chart, Ex. 4 at 30.)

The court thus rejects Defendants' proposed construction as at odds with the claim language of the '496 Patent and not required by the cited prosecution history.  The court further agrees with Plaintiffs that the claim term "substantially continuously along either side of the front portion" carries its plain and ordinary meaning in the context of the asserted claims.  The court therefore declines to construe this claim term.

### 7.  gathered from side-to-side and top-to-bottom by the stretch panel

The claim term "gathered from side-to-side and top-to-bottom by the stretch panel" appears in claim 1 of each Patent.  ('030 Patent at 8:43-44; '496 Patent at 8:38-39.)  Claim 1 of the '030 Patent discloses:

> A male garment comprising:  . . . a stretch panel attached to the body inside the front portion . . . the stretch panel having a length when unstretched smaller than a length measured along the front portion between the first seam and the waistband seam and width when unstretched smaller than a width measured along the front portion between the side seams such that the front portion is gathered from side-to-side and top-to-bottom by the stretch panel and defines a three-dimensional pouch between the stretch panel and the front portion for receiving the wearer's genitals and holding the wearer's genitals while the garment is being worn.

('030 Patent at 8:17-47.)  Claim 1 of the '496 Patent similarly claims a stretch panel that works to "gather[]" the front portion "from side-to-side and top-to-bottom," but refers to the length and width of the stretch panel with reference to the "top and bottom locations" rather than the waistband seam and first seam.  ('496 Patent at 8:31:43.)

The parties propose the following constructions of the claim term "gathered from side-to-side and top-to-bottom by the stretch panel":

**Plaintiffs' Proposed Construction:** Plain and ordinary meaning. Alternatively: "the front portion of the garment's body is drawn up both horizontally and vertically through attachment to the stretch panel, creating a concave space between the stretch panel and the front portion of garment's body capable of receiving the wearer's genitals when the garment is worn."

**Defendants' Proposed Construction:** "puckered by the stretch panel along each of the side, waistband, and first seams."

The court finds that Defendants' proposed construction is problematic for two reasons. First, the word "puckered" or variations thereof never appear in the claim language or specification and, at best, is unhelpful to the jury. (*See generally* '030 Patent; '496 Patent.) Second, Defendants' construction assumes that the stretch panel necessarily extends from the waistband seam to the first seam. (*See* Def. Br. at 14-16.) But as the court has emphasized, the '496 Patent permits the stretch panel to run from a top location (not necessarily the waistband seam) to a bottom location (not necessarily the first seam). Defendants' proposed construction would vitiate that difference between the scope of the '030 Patent's and the '496 Patent's claims. The court thus rejects Defendants' proposed construction.

The court further finds that the claim term "gathered from side-to-side and top-to-bottom by the stretch panel" is clear on its face. The claim language and specification demonstrate that the claim term "gather[]" carries its plain and ordinary meaning, and no intrinsic or extrinsic evidence suggests that a person of ordinary skill in the art would define the term otherwise. For instance, the specification repeatedly

describes the stretch panel as gathering the edges of the front portion to create the pouch in a way consistent with the everyday meaning of "gather." (*See, e.g.*, '030 Patent at 4:22-24 ("The two-way elasticity of stretch panel 22 helps to gather the material of front portion 18 of body 14 to increase the volume of pouch 20.") (referring to Figure 7); *id.* 6:13-18 ("After assembly, stretch panel 22 can contract. This gathers the material of front portion 18 and helps to form pouch 20 to have a three-dimensional volume open to receive the wearer's genitalia . . . .").) The court thus declines to construe "gathered from side-to-side and top-to-bottom by the stretch panel."

   8. <u>asymmetrical stretch characteristics</u>

   The claim term "asymmetrical stretch characteristics" appears in claim 2 of each Patent. Claim 2 discloses "a garment according to claim 1 wherein the stretch panel has asymmetrical stretch characteristics such that the stretch panel stretches more easily in a direction parallel to the waistband and less easily in a direction at right angles to the waistband." ('030 Patent at 8:48-52; *see also* '496 Patent at 8:44-48 (featuring identical claim language).)

   The parties propose the following constructions of the claim term "asymmetrical stretch characteristics":

   **Plaintiffs' Proposed Construction:** "the amount of stretch of the fabric produced when force is applied in one direction differs from the amount of stretch produced when the same amount of force is applied to the fabric in a different direction."

   **Defendants' Proposed Construction:** Indefinite.

At the outset, the parties agree that the specification expressly defines "asymmetrical stretch." (*See* Tr. at 45:21-23, 47:23-48:3.) Specifically, the specification provides:

> In some embodiments, the material of stretch panel 22 has asymmetrical stretch (i.e. the coefficient of elasticity of the material has a first value in a first direction in the plane of the material and a second value different from the first value in a second direction at right angles to the first direction in the plane of the material). The material may be oriented [such] that it is easier to stretch the material of stretch panel 22 in a direction parallel to waistband 12 than it is to stretch the material in a direction perpendicular to waistband 12.

('030 Patent at 5:8-16; *see also* '496 Patent at 5:6-12.)

Notwithstanding this definition, Defendants argue that claim 2 of each Patent is indefinite. (Def. Br. at 16-18.) Defendants emphasize that, although the specification defines "asymmetrical stretch" with reference to the material that comprises the stretch panel, claim 2 of the Patents covers a garment wherein the stretch panel itself has asymmetrical stretch characteristics. (Def. Br. at 17.) According to Defendants, "[o]ne of ordinary skill in the art cannot discern with reasonable certainty whether the 'asymmetrical stretch characteristics' of claim 2 are characteristics of (1) the fabric comprising the stretch panel prior to being sewn into the garment . . . , or (2) the claimed stretch panel, after the fabric is sewn in place." (*Id.* at 16 (emphasis omitted).) Defendants contrast claim 2 to claim 4 of the Patents, which claims a stretch panel that "comprises a *fabric* having a stretch of at least 30%." ('030 Patent at 8:55-56 (emphasis added); *see also* '496 Patent at 8:51-52.) In Defendants' view, "[c]laim 2 provides no such clarity." (Def. Br. at 18.)

Under 35 U.S.C. § 112(2),[10] a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112(2). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). This standard requires that "a patent . . . be precise enough to afford clear notice of what is claimed, . . . while recognizing that absolute precision is unattainable." *Id.* at 909-10. Further, "[a] patent is presumed valid under 35 U.S.C. § 282 and, 'consistent with that principal, a [fact finder is] instructed to evaluate . . . whether an invalidity defense has been proved by clear and convincing evidence.'" *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015) (citation omitted) (alteration in *Biosig*).

As a threshold matter, the court considers whether it must reach Defendants' indefiniteness arguments at the claim construction phase. The Federal Circuit has emphasized that indefiniteness is "inextricably intertwined with claim construction." *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1379 (Fed. Cir. 1999); *see also Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008) ("Indefiniteness is a matter of claim construction, and the same principles that generally govern claim construction are applicable to determining whether allegedly indefinite claim language is

---

[10] The court applies pre-AIA § 112(2). *See supra* § III.B.4-5 n.10.

subject to construction."). Where a claim cannot be construed to satisfy 35 U.S.C. § 112(2), a court may find the term indefinite during claim construction, even in advance of a separate summary judgment motion. *Int'l Test Sols., Inc. v. Mipox Int'l Corp.*, No. 16-CV-00791-RS, 2017 WL 1367975, at *3 (N.D. Cal. Apr. 10, 2017) (citing *Praxair*, 543 F.3d at 1319). As one district court has noted, however, "the Federal Circuit's statements that indefiniteness is intertwined with claim construction mean only that the [c]ourt must attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness, and not that the [c]ourt must determine indefiniteness during the claim construction proceedings." *ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190-EDL, 2002 WL 1892200, at *15 (N.D. Cal. Aug. 15, 2002), *amended sub nom. ASM Am., Inc. v. Genus, Inc.*, No. C-01-2190 EDL, 2003 WL 21033555 (N.D. Cal. Jan. 10, 2003), *aff'd sub nom. ASM Am., Inc. v. Genus, Inc.*, 401 F.3d 1340 (Fed. Cir. 2005).

Indeed, district courts frequently decline to rule on indefiniteness at the *Markman* stage. *See, e.g.*, *Advanced Mrico Devices, Inc. v. LG Elecs., Inc.*, No. 14-cv-01012-SI, 2017 WL 1383271, at *20 (N.D. Cal. Apr. 18, 2017) (collecting cases); *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("Th[e] indefiniteness argument is inappropriate at the claim construction stage."). Such reticence makes sense: "well-settled principles," including the "high burden of proof on a party challenging the patent based on indefiniteness," disfavor ruling on indefiniteness during claim construction. *See CSB-Sys. Int'l Inc. v. SAP Am., Inc.*, No. 10-2156, 2011 WL 3240838, at *17 (E.D. Penn. July 28, 2011); *see also Waddington N. Am., Inc. v.*

*Sabert Corp.*, No. 09-4883 (GEB), 2010 WL 4363137, at *3 (D.N.J. Oct. 27, 2010)

("[P]ractical considerations . . . militate against determining indefiniteness prior to the

end of fact or expert discovery."). "This is especially so if 'the claim language itself is

amenable to construction but is alleged to be indefinite as applied.'" *3-D Matrix, Inc. v.*

*Menicon Co. Ltd.*, No. 14-cv-10205-IT, 2016 WL 111410, at *13 (D. Mass. Jan. 11,

2016) (quoting *Momenta Pharm., Inc. v. Amphastar Pharm, Inc.*, 887 F. Supp. 2d 303,

313 (D. Mass. 2012)).

The court declines to reach Defendants' indefiniteness arguments at this time.

Defendants' indefiniteness challenge does not center on the meaning of the words

"asymmetrical stretch characteristics"; rather, Defendants allege that the claim language

is indefinite as applied, because, in evaluating infringement, a person of ordinary skill in

the art would not know whether to test the material used to make the stretch panel prior to

being sewn into the garment or the stretch panel after assembly. (Def. Br. at 16-18); *see*

*also 3-D Matrix*, 2016 WL 111410, at *13. Put otherwise, Defendants' indefiniteness

arguments venture far beyond the meaning of the claim term and do not bear on whether

the claim term itself is amenable to construction. Moreover, Defendants provide no

expert testimony that would support a finding of indefiniteness, relying exclusively on

attorney argument. (*See generally* Def. Br. at 16-18; Def. Resp. at 20-22.) The court will

be better equipped to assess indefiniteness on a more complete record. *See Cacace v.*

*Meyer Mktg. (Macau Commercial Offshore) Co., Ltd.*, 812 F. Supp. 2d 547, 560

(S.D.N.Y. 2011) (rejecting an indefiniteness challenge where the party "offer[ed] nothing

more than attorney argument"); (*see also* Sched. Order (Dkt. # 22) at 2 (showing that

expert witness reports are not due until August 30, 2019, and fact discovery closes on October 18, 2019).)  The court therefore construes the claim term "asymmetrical stretch characteristics" without prejudice to Defendants re-raising their indefiniteness challenge on summary judgment.

Neither party directs the court to prosecution history or extrinsic evidence bearing on the meaning of "asymmetrical stretch characteristics" (*see generally* Pl. Br. at 18-20; Def. Br. at 16-18), and the court finds that the term is susceptible to construction based on the surrounding claim language and the specification.  As claim 2 of each patent explains, a stretch panel has asymmetrical stretch characteristics when it "stretches more easily in a direction parallel to the waistband and less easily in a direction at right angles to the waistband."  ('030 Patent at 8:48-52; *see also* '496 Patent at 8:44-48.)  The specification describes the same concept with reference to differing "coefficient[s] of elasticity":  in brief, the specification discloses that a material has asymmetrical stretch characteristics when it stretches more easily in one direction than it does in the direction "at right angles to the first direction."  (*See* '030 Patent at 5:8-13; *see also* '496 Patent at 5:4-9.)

Given these disclosures, the court construes "asymmetrical stretch characteristics" as "a property wherein the degree of stretch produced when force is applied in one direction differs from the degree of stretch produced when the same amount of force is applied in a direction at right angles to the first direction."  This construction largely tracks Plaintiffs' proposed construction but omits reference to "the fabric," as that phrase appears in Plaintiffs' proposal.  (*See* Pl. Br. at 18.)  That phrase only muddles the scope

of the claim term, which refers to the "stretch panel" rather than the fabric comprising the

stretch panel.  (*See* '030 Patent at 8:48-49; '496 Patent at 8:44-45.)

9.  <u>rectangular</u>

The claim term "rectangular" appears in dependent claim 3 of each Patent, which

discloses "[a] garment according to claim 1 wherein the stretch panel is rectangular . . . ."

('030 Patent at 8:53-54; '496 Patent at 8:49-50.)

The parties propose the following constructions of the claim term "rectangular":

**Plaintiffs' Proposed Construction:**  "an exterior outline with four corners and

with one opposing pair of edges significantly longer than the other opposing pair of

edges."

**Defendants' Proposed Construction:**  "the shape of a rectangle."

The parties dispute whether claim 3 of the Patents covers only stretch panels that

are perfectly rectangular—that is, having opposing sides of equal lengths and four right

angles—or encompasses stretch panels that are approximately rectangular.  (*See* Pl. Br. at

20-21; Def. Br. at 18-20.)  Defendants insist that the claim language is directed to a

precisely rectangular stretch panel (Def. Br. at 18), whereas Plaintiffs argue that the

stretch panel may be "a shape reminiscent of a rectangle" (Pl. Br. at 20).  Both parties

emphasize that the specification discloses a preferred embodiment—undershorts—in

which the stretch panel is "generally rectangular," as opposed to the "rectangular" stretch

panel covered by claim 3.  (*See* '030 Patent at 4:44-45; '496 Patent at 4:40-41; *see also*

Pl. Br. at 20-21; Def. Br. at 18-20.)

In Defendants' view, the "narrower" claim language supersedes the specification's disclosure of a stretch panel that is "generally rectangular." (Def. Br. at 19.) The court is not convinced. The Patents do not claim a stretch panel that is a rectangle but rather a stretch panel that is, more broadly, "rectangular," a word that leaves ambiguous the degree of mathematical precision required. (*See* '030 Patent at 8:53-54; '496 Patent at 8:49-50.) The Patents' specification—"the single best guide to the meaning of a disputed term," *see Vitronics*, 90 F.3d at 1582—helps resolve this ambiguity, indicating that the claim term is not limited to geometric rectangles. In describing the "generally rectangular" stretch panel of the preferred embodiment, the specification explains that the top and bottom edges of the panel are "equal to within +10% or +15%," and the seams at the sides of the stretch panel "are generally straight and generally perpendicular to [the] waistband . . . ." ('030 Patent at 4:46-49; *see also id.* at Fig. 16 (showing a stretch panel, pre-assembly, that is not a precise rectangle); '496 Patent at 4:40-43; *id.* at Fig. 9.) Read together, the claim language and specification demonstrate that the stretch panel may be "rectangular" even if it is not a geometric rectangle. To construe the claim term otherwise would read out the preferred embodiment in which the stretch panel is generally rectangular, an outcome the court should avoid. *See Vitronics*, 90 F.3d at 1583.

The district court's decision in *Denneroll Holdings Pty Ltd. v. Chirodesign Grp., LLC*, No. 4:15-CV-740, 2016 WL 705207, at *3 (S.D. Tex. Feb. 23, 2016), provides persuasive support for this conclusion. In that case, the court was tasked with construing the claim term "orthogonal." *Id.* at *3. Although the patent at issue merely claimed an "orthogonal" structure, the specification indicated that a key part of the structure was

"substantially" orthogonal. *Id.* The court rejected the defendants' argument that, because

the claim term itself did not contain the modifier "substantially," the claim required a

precisely, rather than a "substantially," orthogonal structure. *Id.* at *4. In so doing, the

court reasoned that "the language of the specification expressly ties the adverb

'substantially' to the term 'orthogonal.'" *Id.* The court further emphasized that the

defendants' mathematically exact construction would read out the patent's preferred

embodiment. *Id.* The analogous circumstances before this court compel a similar

conclusion.

The court agrees with Defendants, however, that Plaintiffs' proposed construction

is deficient. (*See* Def. Br. at 18-20.) Plaintiffs' proposed construction could conceivably

encompass shapes bearing little resemblance to a rectangle. (*See* Pl. Br. at 20; Def. Resp.

at 20.) Moreover, the court finds no support in the intrinsic evidence for the proposed

limitation that would require one opposing pair of edges to be "significantly longer" than

the other.

Instead, the court construes "rectangular" as "having a shape with four corners

wherein the lengths of the top and bottom edges are approximately equal to each other

and the lengths of the left and right edges are approximately equal to each other." This

construction is consistent with both the claim term's plain and ordinary meaning and the

specification's disclosure of a preferred embodiment in which the stretch panel is

"generally rectangular."

//

//

10. <u>a dart seam stitched along a bottom portion of the pouch</u>

The claim term "a dart seam stitched along a bottom portion of the pouch" appears in each Patent's dependent claim 15. That claim covers "[a] garment according to claim 1 wherein the pouch comprises a dart seam stitched along a bottom portion of the pouch and substantially centrally to provide extra volume in front of and underneath the genitals of a wearer." ('030 Patent at 9:23-26; '496 Patent at 9:24-27.)

The parties propose the following constructions of the claim term "a dart seam stitched along a bottom portion of the pouch":

**Plaintiffs' Proposed Construction:** "a shaping seam where material has been folded or removed to provide three-dimensional shaping or space, where the seam is stitched along a bottom portion of the pouch."

**Defendants' Proposed Construction:** "an additional seam present along the bottom portion of the front portion but not along the top portion of the front portion."

The parties disagree about two issues related to the construction of "dart seam stitched along a bottom portion of a pouch." First, the parties dispute whether the claim term should be construed to permit the dart seam to extend to the top portion of the pouch in addition to the bottom portion of the pouch. (*See* Def. Br. at 20-21; Pl. Resp. at 10-11.) Second, the parties dispute whether the court should define "dart seam" as requiring the folding over or removal of fabric to create volume in the pouch. (*See* Pl. Br. at 22-23; Tr. at 59:14-18.)

The first issue is easily resolved. Defendants argue that, "[g]iven the anatomy of male genitalia, the only portion of the pouch that requires extra volume when the

1    undergarment is being worn is the bottom portion of the pouch." (Def. Br. at 20.)

2    Accordingly, in Defendants' view, the court should construe the claim term to specify

3    that the dart seam may not extend "along the top portion of the front portion." (*Id.*) That

4    construction is inconsistent with the claim language. Claim 15 provides that "the pouch

5    comprises a dart seam stitched along a bottom portion of the pouch." ('030 Patent at

6    9:23-24.) As Plaintiffs emphasize, "comprises" is a term of art. (Pl. Br. at 24 (citing

7    *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1344-45 (Fed. Cir. 2003).)

8    The word "comprises" is used in claim language to "mean[] that the named elements are

9    essential, but other elements may be added and still form a construct within the scope of

10    the claim." *Amgen*, 314 F.3d at 1345. Here, because the pouch "comprises" a dart seam

11    stitched along a bottom portion of the pouch, the pouch could conceivably include a dart

12    seam that extends to part of the top portion of the pouch—even though that feature is not

13    seen in the preferred embodiment described in the specification. *See id.* The court thus

14    rejects Defendants' proposal to limit the dart seam to the bottom portion of the pouch

15    alone.[11]

16        As to the second issue, Plaintiffs argue that the court must construe the claim term

17    to reflect that a "dart seam" is a "shaping seam where material is removed or folded

18    over." (Pl. Br. at 22 (emphasis omitted).) That construction finds no support in the claim

19    language or specification. The claim language merely provides that the purpose of the

20

21

22

---

[11] The court notes that, at the *Markman* hearing, Defendants' counsel conceded that this proposed limitation is better addressed as a "non-infringement argument," rather than a claim construction issue. (Tr. at 60:17-22.)

dart seam is to "provide extra volume in front of and underneath the genitals of the wearer"; it does not require that the seam be made through a specific process. (*See* '030 Patent at 9:23-26; *see also* '496 Patent at 9:24-27.) Nor does the specification suggest that the dart seam necessarily arises from the removal or folding over of fabric. Rather, it simply states that the dart seam shapes the front portion to provide volume in the pouch. (*See, e.g.*, '030 Patent at 2:37-46; *see also* '496 Patent at 2:38-42.)

Moreover, the extrinsic evidence Plaintiffs cite does not confirm that a person of ordinary skill in the art of the Patents would understand "dart seam" to necessarily require the removal or folding over of fabric. Plaintiffs rely on two sources that ostensibly discuss dart seams: (1) a 2006 book by Lori A. Knowles called *The Practical Guide to Patternmaking for Fashion Designers: Menswear* ("the Knowles excerpt"), and (2) a 1987 book by Helen Joseph Armstrong called *Patternmaking for Fashion Design* ("the Armstrong excerpt"). (*See* Pl. Br. at 23; Jt. Cl. Chart, Ex. 48 (Dkt. # 47-50) ("Knowles") at 199; Jt. Cl. Chart, Ex. 49 (Dkt. # 47-51) ("Armstrong") at 144-75.) The Armstrong excerpt focuses exclusively on women's dresses. (*See generally* Armstrong.) The court declines to assume that a person of ordinary skill in the art of the Patents would find the Armstrong excerpt relevant to the meaning of the Patents' claims. In any event, Plaintiffs point to no specific portion of the Armstrong excerpt that supports the notion that, as a rule, a dart seam involves the removal or folding over of fabric.[12] (*See* Pl. Br. at

_____

[12] The Armstrong excerpt consists of 65 pages. (*See generally* Armstrong.) The court declines to comb through Plaintiffs' exhibit in search of support for Plaintiffs' proposed construction. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)

23.)  Similarly, the Knowles excerpt, which consists of a single page from a glossary, does not define "dart seam."  (*See generally* Knowles.)  Rather, it refers to "darts" generally as "[a] stitched fold of fabric in a garment that shapes the fabric over the curves of the body."  (*Id.* at 199.)  That definition, although not inconsistent with the specification, adds little to the court's understanding of how a person of ordinary skill in the art would understand the term "dart seam" as used in the context of the Patents.  Put otherwise, Plaintiffs' extrinsic evidence is insufficient to establish that a person of ordinary skill in the art of the Patents would understand "dart seam" to necessarily require the removal or folding over of fabric in the garment's pouch.

Having rejected both parties' proposed definitions of the claim term, the court looks to the intrinsic evidence.  In view of the claim language and specification, the court construes "a dart seam stitched along a bottom portion of the pouch" as "a shaping seam stitched along a bottom portion of the pouch."  The surrounding claim language renders a more detailed definition redundant; it makes clear that the dart seam works to "provide extra volume in front of and underneath the genitals of a wearer."  ('030 Patent at 9:23-26; '496 Patent at 9:24-27.)  Additionally, the specification supports construing "a dart seam" as "a shaping seam."  For instance, the specification indicates that the dart seam plays a "shaping" role, working to make the front portion "non-flat"—*i.e.*, three-dimensional—and helping form the outer shell of the pouch.  (*See* '030 Patent at 6:35-38; *see also* '496 Patent at 31-34.)  Finally, the court finds that the limitation

---

("[J]udges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

"stitched along a bottom portion of a pouch" speaks for itself and does not require construction.

## IV. CONCLUSION

For the foregoing reasons, the court rules as follows:

(1) The court DECLINES TO CONSTRUE "front portion";

(2) The court DECLINES TO CONSTRUE "stretch panel";

(3) The court DECLINES TO CONSTRUE "crotch panel";

(4) The court DECLINES TO CONSTRUE "top location";

(5) The court DECLINES TO CONSTRUE "bottom location";

(6) The court DECLINES TO CONSTRUE "substantially continuously along either side of the front portion";

(7) The court DECLINES TO CONSTRUE "gathered from side-to-side and top-to-bottom by the stretch panel";

(8) The court CONSTRUES "asymmetrical stretch characteristics" as "a property wherein the degree of stretch produced when force is applied in one direction differs from the degree of stretch produced when the same amount of force is applied in a direction at right angles to the first direction";

(9) The court CONSTRUES "rectangular" as "having a shape with four corners wherein the lengths of the top and bottom edges are approximately equal to each other and the lengths of the left and right edges are approximately equal to each other"; and

//

(10)   The court CONSTRUES "a dart seam stitched along a bottom portion of the

         pouch" as "a shaping seam stitched along a bottom portion of the pouch."

Dated this 30th day of July, 2019.



The Honorable James L. Robart
U.S. District Court Judge